## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| APPLICANT: | Anthony J. Antonious |
| RE-EXAM APPLICATION NO.: | 90/010,266 |
| RE-EXAM FILING DATE: | 09/02/2008 |
| PATENT NO.: | 5,735,754 |
| CONFIRMATION NO. | 2019 |
| ATTORNEY DOCKET NO. | ADAM-070208.044 |
| EXAMINER: | Peter English |

## RESPONSE TO OFFICIAL ACTION UNDER 37 CFR 1.530

Mail Stop: Ex-Parte Re-Exam
Central Re-Examination Unit
Hon. Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the final Official Action dated August 27, 2009, kindly enter of record the following Amendments and Remarks:

**Amendments to the Specification** begin on page 2 of this paper.

**Amendments to the Claims** begin on page 4 of this paper.

**Status of the Claims** begins on page 6 of this paper.

**Amendments to the Drawings** none.

**Remarks/Arguments** begin on page 7 of this paper.

---

CERTIFICATE OF TRANSMISSION

I hereby certify that, on the date shown below, this correspondence is being facsimile transmitted to the Commissioner for Patents, at Fax No. (571) 273-8900.

Marcia Scruggs
Typed or printed name of person signing this certificate

Signature _____      Date  9/24/2009

PAGE 2/9 * RCVD AT 9/24/2009 5:10:00 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-5/41 * DNIS:2739900 * CSID:9544890332 * DURATION (mm-ss):04-00

EXHIBIT 16
Page 150

Application No. 90/010,266
Amdt. dated 9/24/2009
Reply to Office Action dated 8/27/2009

## Amendments to the Specification:

1. In Column 2, please amend the last paragraph (lines 53-67) to:

FIGS. 1-5 show a first embodiment of a golf club head 100 in accordance with the present invention. The golf club head 100 is conventional in shape, except for the aerodynamic surfaces and includes a hosel 112, heel 114, toe 116, upper surface 118, rear surface 120, ball striking face 122 and bottom surface 124. The bottom sole 124 includes a skid member 126 which extends outwardly from the bottom sole 124 and is separated therefrom by a spacer wall 128. A c-shaped aerodynamic slot 130 is formed on, and substantially parallel with, the bottom surface 124 and faces forwardly with open ends 132 of the c-shaped slot 130 being toward the ball striking face 122. As shown in Fig. 1, c-shaped aerodynamic slot 130 transects a virtual centerline that passes through ball striking face 122 and rear surface 120 of the club head. Preferably, the c-shaped slot 130 extends from a point adjacent the interface of the bottom surface 124 and rear surface 120 across approximately two thirds of the distance to the ball striking face 122.

2. In Column 3, please amend the fourth paragraph (lines 22-26) to:

FIG. 9 shows another embodiment of the present invention. A golf club head 300 is similar to the club head described in FIGS. 1-5 and includes a bottom surface 325, a side surface 327 and an aerodynamic slot 330 on said bottom surface which is substantially parallel with the bottom surface, and offset from a virtual centerline that passes transversely through a heel-to-toe axis of the club head, in the direction of the toe 316 of the club head 300, with a portion of slot 330 passing through the virtual centerline.

EXHIBIT 16
Page 151

09/24/2009  05:03   9544890332  .                        SILVERMAN AND ASSOCS                    PAGE  04/09

Application No. 90/010,266
Amdt. dated 9/24/2009
Reply to Office Action dated 8/27/2009

3. In Column 3, please amend the fifth paragraph (lines 27-30) to:

FIG. 10 shows another embodiment similar to FIG. 9. A golf club head 400 [and] includes a bottom surface 425, a side surface 427 and an aerodynamic slot 430 on said bottom surface which is offset from a virtual centerline that passes transversely through a heel-to-toe axis of the club head, in the direction of the heel 414 of the club head 400, with a portion of slot 430 passing through the virtual centerline.

PAGE 4/9 * RCVD AT 9/24/2009 5:10:00 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-5/41 * DNIS:2739900 * CSID:9544890332 * DURATION (mm-ss):04-00

EXHIBIT 16
Page 152

09/24/2009  05:03    9544890332                     SILVERMAN AND ASSOCS                    PAGE  05/09

Application No. 90/010,268
Amdt. dated 9/24/2009
Reply to Office Action dated 8/27/2009

## Amendments to the Claims:

This listing of claims will replace all prior versions, and prior listing of claims in this application:

1. (Twice amended)  An aerodynamic golf club head including a club head body having a heel, toe, rear surface, ball striking face, upper surface and bottom surface, wherein the improvement comprises:

an aerodynamic configuration on, and substantially parallel with, said bottom surface adjacent said rear surface in the form of a c-shaped slot having an open end facing forwardly toward said ball striking face; said aerodynamic configuration further including a skid surface formed on and raised from said bottom surface; said skid surface having a wall separating said skid surface from said bottom surface, said c-shaped slot transecting a virtual centerline passing through said ball striking face and said rear surface of said club head.

2. (Original)   The aerodynamic golf club head of claim 1 further including a venturi opening in fluid communication with and extending rearwardly from said c-shaped aerodynamic slot toward said rear surface.

3. (Twice Amended)  The aerodynamic golf club head of claim 1 wherein said slot is [further defined by being] offset from said heel of said club head.

4. Cancelled.

5. (Amended)  The aerodynamic golf club head of claim [4] 9 wherein said slot is offset toward said heel.

PAGE 5/9 * RCVD AT 9/24/2009 5:10:00 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-5/41 * DNIS:2739900 * CSID:9544890332 * DURATION (mm-ss):04-00

EXHIBIT 16
Page 153

Application No. 90/010,266
Amdt. dated 9/24/2009
Reply to Office Action dated 8/27/2009

6. (Amended)  The aerodynamic golf club head of claim [4] 9 wherein said slot is offset toward said toe.

7. (Twice amended) The aerodynamic golf club of claim 1 wherein said slot is [further defined by being] offset from said toe of said club head.

8. (Original)  An aerodynamic golf club head including a club head body having a heel, toe, rear surface, ball striking face, upper surface and bottom surface, wherein the improvement comprises:

an aerodynamic configuration on said bottom surface adjacent said rear surface in the form of a c-shaped slot having an open end facing forwardly toward said ball striking face; said aerodynamic configuration further including a venturi opening in fluid communication with and extending rearwardly from said c-shaped aerodynamic slot toward said rear surface.

9. (New)  An aerodynamic golf club head including a club head body having a heel, toe, rear surface, ball striking face, upper surface and bottom surface, in which the improvement comprises:

an aerodynamic configuration within, and substantially parallel to, said bottom surface, adjacent said rear surface, in the form of a c-shaped slot having an open end facing forwardly toward said ball striking face, said slot offset from, and a portion thereof passing through, a virtual centerline passing transversely through a heel-to-toe axis of said club head.

Page 5 of 8

EXHIBIT 16
Page 154

09/24/2009  05:03    9544890332              SILVERMAN AND ASSOCS              PAGE  07/09

Application No. 90/010,266
Amdt. dated 9/24/2009
Reply to Office Action dated 8/27/2009

## Status of the Claims:

| | |
|---|---|
| Claim 1 | Twice amended |
| Claim 2 | Original |
| Claim 3 | Twice amended |
| Claim 4 | Canceled |
| Claim 5 | Once amended |
| Claim 6 | Once amended |
| Claim 7 | Twice amended |
| Claim 8 | Original |
| Claim 9 | New |

PAGE 7/9 * RCVD AT 9/24/2009 5:10:00 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-5/41 * DNIS:2739900 * CSID:9544890332 * DURATION (mm-ss):04-00

EXHIBIT 16
Page 155

Application No. 90/010,266
Amdt. dated 9/24/2009
Reply to Office Action dated 8/27/2009

## REMARKS/ARGUMENTS

### 1. Response to objection of the specification

The Specification has been amended to correct a typographic error in the patent, as suggested by the Examiner.

The Specification has been further amended to provide proper antecedent basis for the claimed subject matter defined in amended Claim 1 and new Claim 9. At the same time, Claims 1 and 9 have also been amended with regard to the definitions of the virtual centerlines by using the structural terms more consistent with those used in the patent. It is submitted that such further amended Claims 1 and 9 are also consistent with the patentable subject matter identified in Paragraph 14 of the final Office Action.

It is further submitted that no new matter is introduced by the amendment.

Accordingly, the patent owner respectfully requests withdrawal of the objection to the Specification.

### 2. Response to objection of Claims 1, 3, 5-7 and 9

Claims 1, 3, 5-7 and 9 have been amended to fully comply with 37 CFR 1.530(f) and (i).

Therefore, patent owner respectfully requests withdrawal of the objection to Claims 1, 3, 5-7 and 9.

### 3. Response to rejection of Claims 3, 5-7 and 9 under 35 U.S.C. 112, second paragraph

Claims 3, 7 and 9 have been amended to be consistent with the term used in the original claims.

### Page 7 of 8

EXHIBIT 16
Page 156

09/24/2009  05:03   9544890332              SILVERMAN AND ASSOCS              PAGE  09/09

Application No. 90/010,266
Amdt. dated 9/24/2009
Reply to Office Action dated 8/27/2009

Therefore, the patent owner respectfully requests withdrawal of the rejection of Claims 3, 5-7 and 9 under 35 U.S.C. 112, second paragraph.

### 4. Response to rejection of Claims 1-3, 5-7 and 9 under 35 U.S.C. 305

Claims 1, 3, 7 and 9 have been amended to be consistent with the terms used in the original claims.

Therefore, the patent owner respectfully requests withdrawal of the rejection of Claims 1-3, 5-7 and 9 under 35 U.S.C. 305.

### 5. Patentable claims

The Examiner states that Claim 8 is confirmed as patentable. The Examiner further states that Claims 1-3, 5-7 and 9 would be patentable if amended or rewritten to overcome the rejections under 35 USC 112 and 35 USC 305.

The patent owner appreciates the Examiner's statement of patentability.  In the above response, both rejections have been overcome. Therefore, it is respectfully submitted that Claims 1-3 and 5-9, the pending claims, are now patentable.

Respectfully submitted,
IRREVOCABLE TRUST OF
ANTHONY ANTONIOUS

_9/24/ 07_
Date of Signature

By: Melvin K. Silverman
Registration No. 26,234

Please address correspondence to:
Customer No. 27353

Page 8 of 8

EXHIBIT 16
Page 157

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/010,266 | 09/02/2008 | 5735754 | ADAM-070208.044 | 2019 |

27353     7590     10/09/2009

MELVIN K. SILVERMAN AND ASSOCS PC
500 WEST CYPRESS CREEK ROAD
SUITE 350
FT. LAUDERDALE, FL  33309

| EXAMINER |
|---|

| ART UNIT | PAPER NUMBER |
|---|---|

DATE MAILED: 10/09/2009

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Michael J. Gallagher
GALLAGHER & DAWSEY CO, LPA
PO Box 785
Columbus, OH 43216

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/010,266*.

PATENT NO. *5735754*.

ART UNIT *3993*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| | Control No. | Patent Under Reexamination |
|---|---|---|
| **Notice of Intent to Issue Ex Parte Reexamination Certificate** | 90/010,266 | 5735754 |
| | Examiner | Art Unit | |
| | PETER C. ENGLISH | 3993 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

1. ☒ Prosecution on the merits is (or remains) closed in this *ex parte* reexamination proceeding. This proceeding is subject to reopening at the initiative of the Office or upon petition. *Cf.* 37 CFR 1.313(a). A Certificate will be issued in view of
    (a) ☒ Patent owner's communication(s) filed: <u>24 September 2009</u>.
    (b) ☐ Patent owner's late response filed: _____.
    (c) ☐ Patent owner's failure to file an appropriate response to the Office action mailed: _____.
    (d) ☐ Patent owner's failure to timely file an Appeal Brief (37 CFR 41.31).
    (e) ☐ Other: _____.

    Status of *Ex Parte* Reexamination:
    (f) Change in the Specification: ☒ Yes ☐ No
    (g) Change in the Drawing(s): ☐ Yes ☒ No
    (h) Status of the Claim(s):
        (1) Patent claim(s) confirmed: <u>8</u>.
        (2) Patent claim(s) amended (including dependent on amended claim(s)): <u>1-3 and 5-7</u>
        (3) Patent claim(s) cancelled: <u>4</u>.
        (4) Newly presented claim(s) patentable: <u>9</u>.
        (5) Newly presented cancelled claims: _____.

2. ☒ Note the attached statement of reasons for patentability and/or confirmation. Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays. Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."

3. ☐ Note attached NOTICE OF REFERENCES CITED (PTO-892).

4. ☐ Note attached LIST OF REFERENCES CITED (PTO/SB/08).

5. ☐ The drawing correction request filed on _____ is: ☐ approved   ☐ disapproved.

6. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All   b)☐ Some*   c)☐ None   of the certified copies have
        ☐ been received.
        ☐ not been received.
        ☐ been filed in Application No. _____.
        ☐ been filed in reexamination Control No. _____.
        ☐ been received by the International Bureau in PCT Application No. _____.

    * Certified copies not received: _____.

7. ☐ Note attached Examiner's Amendment.

8. ☐ Note attached Interview Summary (PTO-474).

9. ☐ Other: _____.

cc: Requester (if third party requester)

U.S. Patent and Trademark Office
PTOL-469 (Rev.08-06)          **Notice of Intent to Issue Ex Parte Reexamination Certificate**          Part of Paper No 20091007

EXHIBIT 17
Page 160

Application/Control Number: 90/010,266                                    Page 2

Art Unit: 3993

## STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

1.      The following is an examiner's statement of reasons for patentability and/or confirmation
of the claims found patentable in this reexamination proceeding:

        Claim 1 is patentable because the cited prior art patents and printed publications fail to
teach a golf club head, as defined in this claim, including a C-shaped slot on the bottom surface
of the club head, and a skid surface raised from the bottom surface and separated from the
bottom surface by a wall, wherein the slot is substantially parallel with the bottom surface and
transects a centerline passing through the ball striking face and rear surface of the club head.

        Claims 2, 3 and 7 are patentable because of their dependency from claim 1. Further,
claim 2 is patentable because the cited prior art patents and printed publications fail to teach a
golf club head, as defined in this claim, including a C-shaped slot on the bottom surface of the
club head together with a venturi opening in fluid communication with and extending rearwardly
from the C-shaped slot toward the rear surface of the club head.

        Claim 8 is confirmed as patentable because the cited prior art patents and printed
publications fail to teach a golf club head, as defined in this claim, including a C-shaped slot on
the bottom surface of the club head together with a venturi opening in fluid communication with
and extending rearwardly from the C-shaped slot toward the rear surface of the club head.

        Claim 9 is patentable because the cited prior art patents and printed publications fail to
teach a golf club head, as defined in this claim, including a C-shaped slot within the bottom
surface of the club head, the slot being substantially parallel to the bottom surface and offset
from a centerline passing transversely through a heel-to-toe axis of the club head, with a portion
of the slot passing through the centerline.

        Claims 5 and 6 are patentable because of their dependency from claim 9.

2.      Any comments considered necessary by PATENT OWNER regarding the above
statement must be submitted promptly to avoid processing delays. Such submission by the
patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or
Confirmation" and will be placed in the reexamination file.

EXHIBIT 17
Page 161

Application/Control Number: 90/010,266                                    Page 3

Art Unit: 3993

3.      Responses to this Office action may be submitted by facsimile and should be directed to

the Central Reexamination Unit using facsimile number 571-273-9900. A confirmation of receipt

will be generated automatically for all papers transmitted via this facsimile number.

        All responses to be delivered by the United States Postal Service (USPS) should be

addressed as follows:

                Mail Stop Ex Parte Reexam
                Central Reexamination Unit
                Commissioner for Patents
                PO Box 1450
                Alexandria, VA 22313-1450

        Hand-delivered responses should be labeled "Attn: Central Reexamination Unit" and

delivered to:

                Customer Service Window
                Randolph Building, Lobby Level
                401 Dulany Street
                Alexandria, VA 22314

        Submissions for reexamination proceedings may also be submitted through EFS-Web

(the USPTO's web-based document submission system).


4.      Any document filed by either the patent owner or third party requester ***must be served*** on

the other party (or parties in a merged proceeding) in the reexamination proceeding in the

manner provided by 37 CFR 1.248. See 37 CFR 1.550(f) and MPEP 2266.03.


5.      Any inquiry concerning this communication or earlier communications from the

Reexamination Examiner should be directed to Peter English whose telephone number is

(571)272-6671. The examiner can normally be reached on Monday through Thursday (7:00 AM

- 5:00 PM). If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Andres Kashnikow, can be reached at 571-272-4361.

EXHIBIT 17
Page 162

Application/Control Number: 90/010,266                                        Page 4
Art Unit: 3993

For general information regarding reexamination proceedings please call the Central

Reexamination Unit at 571-272-7705. For guidance on reexamination practice and procedure

please call the Office of Patent Legal Administration at 571-272-7703.

Peter C. English    10/7/09
Primary Examiner
Central Reexamination Unit

Conferees:

pe
7 October 2009

EXHIBIT 17
Page 163



EXHIBIT 18
Page 164



EXHIBIT 18
Page 165



EXHIBIT 18
Page 166



EXHIBIT 18
Page 167



EXHIBIT 18
Page 168



THE GOLF COURSE

**WHAT'S NEW**

Big hopes for some big-ticket items

HOT LINE

Tour Edge's custom fit Fibersonic HP Irons (800-515-3346) feature ultralight graphite shafts, designed to produce more distance and higher shots, especially for slower swingers. Set of eight: $780.

# Sizing It Up

JUST WEAR IT. Nike knows a thing or two about athletic shoes. So it's no surprise that the new Air Zoom Tour leather golf shoes are comfortable, waterproof, and stylish. In fact, the pair we tried felt good throughout the round. One reason is "Zoom Air" technology, a five-millimeter-thick air bag between the foot and the shoe's sole. It truly feels like walking on air—particularly pleasing tramping on cart paths. The Air Zoom's have a two-year waterproof guarantee (thanks to a Gore-Tex bootie) and a 30-day comfort guarantee. (If you're not satisfied with how the shoes feel, most retailers will refund your money.) We also noticed a



good deal of lateral stability while swinging and traction glue in the ceramic spikes that don't wear down. Finally, if you remember Nike shoes usually running on the small side, worry no more. Their new sizes are in line with the rest of the industry. (800-344-6453). Price: $175.

**AIRING IT OUT.** When I think "aerodynamics," I think airplane wings—huge hunks of metal cutting through the air at hundreds of miles an hour. Now companies want me to think golf clubs. A few years ago, Yonex claimed two indentations on the top of its ADX graphite woods increased air flow. Nicklaus Golf is now giving its Air Bear Titanium woods similar claims—faster swing speeds without swinging harder. The chief design engineer says an air-flow channel along the sole lowers air around the oversized head and reduces drag forces; the

channel also is supposed to balance the clubhead for less twisting on heel and toe hits. I took both my skepticism and the 9-degree driver (also available in 10.5-) out for a few rounds. I found a stick with plenty of headweight (I knew where it is during the swing) and nice overall weight. The stiff-flex (105 to 104 mph), ultralight shaft (44 1/2 inches long) plays plenty stiff, too. My natural shot is a draw, but I had trouble turning this over. When I did, I hit a few rockets (with a boring trajectory) past my own 43-inch midsized metal club. But for the most part, this controlled ball traveled similar distances to mine. Titanium fairway woods are expected out soon. (800-122-1873). Price: $400 per club with graphite shaft only.

**RESIST TWIST.** Slotline has been very successful over the years with its putters. The most popular series, the High Moment Inertial, has a lightweight aluminum-titanium body and heavy lead inserts that place 97 percent of the head's weight in the heel and toe cavities. The critical material in the new putters is tungsten (three times denser than steel). The Tungsten Solero (below) has a tungsten head with a "purite" (lightweight) composite insert. The combination of a heavy metal with a light insert helps this "blade" stay relatively square when balls are struck intentionally on the heel or toe. The heavy, face-balanced head swings weight is D-8; generates smooth strokes and a sweet feel on contact. The sound, however, is discouraging. The high-pitched, tinny echo sounds like the insert is loose, which it isn't. Also disconcerting is the price tag, which means this is a good putter but not such a great buy. Price: $300.

More typical of the venerable toe-toe style is the Tungsten Raider. This head-toe putter has an aluminum body (with a milled face) and tungsten cylinders in the heel and toe. Company officials say the sweetspot area is five times larger than other blades. (800-854-8109). Price: $150.

BY ROB SAUERHAFT

EXHIBIT 18
Page 169



US006257991B1

(12) **United States Patent**
Ortiz

(10) Patent No.: **US 6,257,991 B1**
(45) Date of Patent: *Jul. 10, 2001

(54) **METAL CLUBHEAD AND DRIVER**

(75) Inventor: **Jesse J. Ortiz**, Hillsborough, CA (US)

(73) Assignee: **Orlimar Golf Co.**, Hayward, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/791,099**

(22) Filed: **Nov. 8, 1996**

(51) Int. Cl.[7] ............................ A63B 53/02; A63B 53/04
(52) U.S. Cl. .......................... 473/309; 473/310; 473/328; 473/345
(58) Field of Search ...................... 473/305–315, 473/324, 219, 328, 345, 346; D21/733

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D. 247,922 | * | 5/1978 | Sheldon | ................................ 473/328 |
| 1,787,415 | * | 12/1930 | Washington | ........................... 473/312 |
| 2,880,002 | * | 3/1959 | Wetty | ..................................... 473/349 |
| 3,997,170 | * | 12/1976 | Goldberg . | |
| 4,065,133 | * | 12/1977 | Gordos . | |
| 4,432,549 | * | 2/1984 | Zebelean . | |
| 4,438,931 | * | 3/1984 | Motomiya . | |
| 5,094,383 | * | 3/1992 | Anderon . | |
| 5,203,565 | * | 4/1993 | Murray . | |
| 5,232,224 | * | 8/1993 | Zeider | ................................... 473/345 |
| 5,335,909 | * | 8/1994 | Green | .................................... 473/305 |
| 5,435,558 | * | 7/1995 | Iriarte . | |
| 5,441,263 | * | 8/1995 | Gorman . | |
| 5,456,469 | * | 10/1995 | MacDougall . | |
| 5,547,427 | * | 8/1996 | Rigal et al. | ........................ 473/346 |
| 5,720,674 | * | 2/1998 | Galy . | |
| 5,735,754 | * | 4/1998 | Antonious . | |

FOREIGN PATENT DOCUMENTS

371665   *   4/1932   (GB)   .................................... 273/80.3

OTHER PUBLICATIONS

Apr. 1992, brochure, title Orlimar Handcrafted Distinction (brochure, 7 pages (including front and rear covers)). See entire brochure, especially pages 1 and 3.

* cited by examiner

*Primary Examiner*—Sebastiano Passaniti
*Assistant Examiner*—Stephen L. Blau
(74) *Attorney, Agent, or Firm*—Philip A. Dalton

(57) **ABSTRACT**

A metal driver golf clubhead comprises a first member comprising the sole, toe, heel and rear of the clubhead; a second member comprising the face of the clubhead and joined to the first member along a generally vertically plane behind the face; and at least a pair of elongated grooves extending in the rear-to-front along the sole of the first member, terminating at the leading edge of the sole for reducing drag in the sole area. The runners which extend to the leading edge reduce the area which strikes the ground and allows the club to release from the initial dig into the turf. The hosel has an internal bore into which the golf club shaft is inserted and mounted, and a reverse tapered surface for securing the hosel and the club shaft in a mating bore in the clubhead. This increases the weight in the head, increases resistance to twist/torque, and imparts a more solid feel, including during the striking of a ball.

**6 Claims, 2 Drawing Sheets**



EXHIBIT 19
Page 170

**U.S. Patent**          Jul. 10, 2001          Sheet 1 of 2          **US 6,257,991 B1**



Fig. 1

Fig. 3

Fig. 2

EXHIBIT 19
Page 171



*Fig. 4*

*Fig. 5*

EXHIBIT 19
Page 172

US 6,257,991 B1

1

## METAL CLUBHEAD AND DRIVER

### I. BACKGROUND OF THE INVENTION

A. Field of the Invention

The present invention relates to golf clubs and, in particular, to metal drivers.

B. Definition of Term(s) and Discussion of Existing Technology

As used here "drivers" refers to golf clubs traditionally called "woods" and includes metal embodiments of such clubs, that is, metal woods or metal drivers.

The clubheads of prior art metal woods or drivers typically comprise two sections which are joined or welded along a generally horizontal plane above the sole.

### II. SUMMARY OF THE INVENTION

In one aspect, the present invention is embodied in a metal driver golf club, in which the clubhead comprises a first body or member which itself comprises the sole, toe, heel and rear of the clubhead; and a second body or member which comprises the face of the clubhead. The two members are joined, for example, by a weld along a generally vertical joining line which is located at the periphery of the face of the clubhead and is coincident with the leading edge of the sole.

In a preferred embodiment, the hosel comprises a tube or shaft having opposite ends and having an internal bore into which the golf club shaft is inserted and mounted. At least the upper section of the hosel is enlarged, and has a reverse taper. The clubhead has a mating reverse tapered bore in which the hosel is mounted. The hosel and the associated golf club shaft are joined to the clubhead, by inserting or injecting a joining medium such as epoxy into the bore along with the hosel and shaft.

In another preferred aspect, the hosel has a stepped configuration. At a point between the two opposite ends, the tube expands via a shoulder to an enlarged cross-section which decreases toward the outer (upper) end of the hosel. The mating body bore comprises a relatively small cross-section, lower section which corresponds to the relatively small cross-section, lower section of the hosel, and a relatively large cross-section, reverse taper upper section, which corresponds to the relatively large cross-section, upper section of the hosel. The diameter of the bore is approximately the same dimension as or slightly larger than the diameter of the corresponding sections of the hosel. The relatively wide lower end of the tapered section of the hosel is countersunk within and captured by the bore and the head. This arrangement increases the weight in the head, increases the strength of the club, provides a more solid feel, including during the striking of a ball, and provides increased resistance to twist/torque.

Preferably, the clubhead comprises at least a pair of runners or grooves extending along the sole of the first member, rear-to-front, which guide the clubhead in the direction of the grooves if the clubhead strikes the ground. As alluded to above, the use of two members which are joined in a vertical plane permits positioning the join line at the periphery of the face and along the leading edge of the sole. This permits extended length runners, which extend preferably from the rear section of the sole to the leading edge thereof. Preferably the runners have a reverse chisel configuration defined by a relatively flat orientation at the rear which angles upwardly at the front. These runners facilitate the club's ability to track and square through the

2

shot. Drag is reduced in the sole area. The runners which extend to the leading edge, reduce the area which strikes the ground, and allows the club to release from the initial dig into the turf.

Other embodiments and arrangements are described in the accompanying specification, including

### III. BRIEF DESCRIPTION OF THE DRAWING

The present invention is described below with reference to the drawing, in which:

FIG. 1 is a face (front) elevation view of a metal driver in accordance with the present invention.

FIG. 2 is a heel elevation view of the metal driver of FIG. 1.

FIG. 3 is a perspective view of the driver of FIG. 1, taken generally from a rear perspective toward the heel of the clubhead.

FIG. 4 is a bottom plan view of the driver of FIG. 1.

FIG. 5 is a vertical section view taken along line 5—5 in FIG. 4.

### IV. DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT(S)

FIG. 1 is a front (face side) elevation view of a preferred embodiment 10 of a metal driver clubhead according to the present invention. The clubhead 10 comprises a first (body) member 12 which includes sole 14, toe 15, heel 16 and rear 17 of the body of the clubhead; and a second (face) member 18 which comprises face 20 of the clubhead 10. In contrast to the prior art's horizontal joining of the soleplate to the upper body to form the clubhead, according to the present invention, the second member 18 is joined to the first member 12 along an arcuate joining line 22 in a generally vertical plane defined by the front periphery of the first member 12 and the rear periphery of the second member 18. The two members 12 and 18 are joined for example by welding along the vertical plane or joining line 22.

As shown most clearly in FIGS. 1 and 5, the clubhead includes a countersunk hosel 24 in the form of a stepped shaft having an internal bore 28 into which golf club shaft 30 is inserted and mounted. The first member 12 has a mating stepped bore 32 in which the hosel is mounted. Specifically, the hosel 24 comprises a lower, relatively small diameter tubular section 34 and an upper, relatively large diameter tubular section 36 which are joined by shoulder 38. The upper section 36 has a reverse taper along its length in that its diameter decreases in the outward direction (the direction away from the clubhead) and the diameter of the lower end 40 is larger than that of the upper end 42. The mating body bore 32 of the member 12, comprises a relatively small diameter lower section 44, a relatively large diameter, reverse taper upper section 46, and shoulder 48. In the present embodiment, the lower section is a right cylinder and the upper section is a tapered cylinder.

In the reverse-tapered hosel 24-bore 28 arrangement, the end 42 and the relatively narrow section (small diameter section) of the hosel adjacent the end 42 are external to the bore and to the head. The end 40 and the relatively wide section (large diameter section) of the hosel adjacent the end 40 are countersunk into and captured within the head. This arrangement both increases the weight in the head (increases the weight concentration in the head) and increases the strength of the hosel-to-shaft-to-head joinder and of the club. The result is a more solid feel, including during the striking of a ball, and increased resistance to twist/torque.

EXHIBIT 19
Page 173

US 6,257,991 B1

3

In a presently preferred embodiment, the metal head (both sections) is 17-4 stainless steel, the hosel or neck is titanium, and the shaft is graphite. Metal epoxy is used to join the head, hosel and shaft together. Other materials will be chosen by 1E those of usual skill in the art. By way of example but certainly not limitation, the shaft may be carbon steel.

Referring now to FIGS. 2, 4 and 5, preferably the clubhead 10 comprises at least a pair of runners or grooves 52—52 which extend along the sole 14 of the first member 12, in a rear-front direction. As alluded to above, the use of the two members 12 and 18 joined in a vertical plane permits the use of a member 18 which comprises substantially only the face 20 of the club and permits positioning the vertical join line 22 just behind the face. In contrast to the prior art joining line, which would interfere with and limit forward extension of any runners, the vertical joining line 22 permits the use of extended, continuous, long runners 52—52 which reach to the leading edge 53 at the face of the clubhead. As shown in FIGS. 4 and 5, preferably the runners have a reverse chisel configuration defined by a relatively flat orientation at the rear which angles upwardly at the front.

The extended length, reverse chisel runners facilitate the club's ability to track and square through the shot. Drag is reduced in the sole area. In prior art clubheads, normally the lower leading edge strikes the ground. In my club, the use of runners which extend to the leading edge, reduces the area which strikes the ground, and allows the club to release from the initial dig into the turf.

In another aspect, a C-shaped groove 54 is formed around the periphery of the clubhead sole 14, with ends terminating at the front of the body member 12 adjacent the joining line 22/sole leading edge 53. The groove 54 is both cosmetic and functional, in that it is thought to impart a heavier, directed wind tunnel-generated appearance, and in that it permits the sole plate 14 to extend lower, lowering the center of gravity.

To assemble the driver, the two members 12 and 18 are welded together along joining line 22. The hosel 24 is inserted into the body bore 32 and epoxy is inserted into the bore. While the epoxy is fresh (before it cures), the club shaft 30 is inserted into the hosel, thereby mixing the epoxy between the shaft, hosel and head, and enhancing the strength of the joinder of the shaft and the hosel to one another and to the clubhead.

Having thus described preferred and alternative embodiments of the present invention, those of usual skill in the art will readily derive modifications and extensions within the scope of this invention and limited only by the extent of the present claims.

4

What is claimed is:

1. A metal driver clubhead, comprising: a first member forming the body of the clubhead and comprising sole, toe, heel and rear sections thereof; a second member comprising a face section of the clubhead; the first member and the second member being joined along a generally vertical plane behind and proximate the face section; a joining medium securing the first and second members together; a hosel comprising a section having a reverse exterior taper forming relatively small and relatively large ends and further comprising an internal bore into which a golf club shaft is inserted; the first member comprising a reverse tapered bore capturing the large end of the reverse tapered hosel, with the reverse exterior taper of the hosel mating against the reverse tapered body bore, thereby locking the hosel inside the bore.

2. The metal driver clubhead of claim 1, further comprising at least a pair of grooves extending in a rear-to-front direction along the sole of the first member to a leading edge of the sole.

3. The metal driver clubhead of claim 2, wherein the first member includes a front edge and the sole extends to the front edge, and wherein the clubhead further comprises a C-shaped groove extending about the periphery of the sole and having ends thereof terminating adjacent the front edge.

4. The metal driver of claim 1, wherein the hosel is stepped and comprises a lower, relatively small diameter cylindrical section and an upper, relatively large diameter cylindrical section separated by a shoulder; the upper cylindrical section of the hosel having a reverse taper along its length formed by the diameter of the hosel decreasing in the direction away from the clubhead such that the diameter of an upper end thereof is smaller than the diameter of a lower enlayed end thereof; the mating body bore comprising a relatively small diameter cylindrical lower section and a relatively large diameter, reverse taper cylindrical upper section separated by a shoulder; and the diameter of the bore being approximately the same dimension or slightly larger than the diameter of the corresponding sections of the hosel, so that insertion of the hosel captures both the lower section of the hosel and the enlarged end of the reverse tapered upper section of the hosel.

5. The metal driver clubhead of claim 4, further comprising at least a pair of grooves extending in a rear-to-front direction along the sole of the first member to a leading edge of the sole.

6. The metal driver clubhead of claim 5, wherein the first member includes a front edge and the sole extends to the front edge, and wherein the clubhead further comprises a C-shaped groove extending about the periphery of the sole and having ends thereof terminating adjacent the front edge.

*    *    *    *    *

EXHIBIT 19
Page 174

US00D350176S

# United States Patent [19]

## Antonious

[11]   Patent Number:   **Des. 350,176**

[45]   Date of Patent: ✳✳ **Aug. 30, 1994**

[54]   **WOOD TYPE GOLF CLUB HEAD**

[76]   Inventor:   **Anthony J. Antonious,** 7738 Calle Facil, Sarasota, Fla. 34238

[**]   Term:   **14 Years**

[21]   Appl. No.: **1,517**

[22]   Filed:   **Nov. 16, 1992**
[52]   U.S. Cl. .................................................. **D21/214**
[58]   Field of Search ................................. 273/167–175; D21/214–222

[56]   **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 247,922 | 5/1978 | Sheldon | 273/167 A |
| D. 343,434 | 1/1994 | Heimstetter et al. | D21/214 |
| 1,139,738 | 5/1915 | Tyler | D21/214 |

OTHER PUBLICATIONS

Golf World, Aug. 19, 1977, p. 37, bottom right, golf wood.

*Primary Examiner*—Melvin B. Feifer
*Attorney, Agent, or Firm*—N. J. Aquilino

[57]   **CLAIM**

The ornamental design for a wood type golf club head, as shown and described.

**DESCRIPTION**

FIG. 1 is a front elevational view of a wood type golf club head showing my new design;
FIG. 2 is a top plan view thereof;
FIG. 3 is a rear elevational view thereof;
FIG. 4 is an end elevational view thereof;
FIG. 5 is an end elevational view taken from the opposite end of FIG. 4; and,
FIG. 6 is a bottom view thereof.



EXHIBIT 20
Page 175

**U.S. Patent**       Aug. 30, 1994       Sheet 1 of 2       **Des. 350,176**



FIG. 1

FIG. 2



FIG. 3



EXHIBIT 20
Page 176

**U.S. Patent**          Aug. 30, 1994          Sheet 2 of 2          **Des. 350,176**



FIG. 4

FIG. 5





FIG. 6

EXHIBIT 20
Page 177

US00D363961S

# United States Patent [19]

## Krzynowek et al.

| | |
|---|---|
| [11] | **Patent Number:** **Des. 363,961** |
| [45] | **Date of Patent:** **\*\*Nov. 7, 1995** |

[54] **GOLF CLUB**

[75] Inventors: **John Krzynowek**, Wilbraham; **Thomas M. Greene**, Monson, both of Mass.

[73] Assignee: **Lisco, Inc.**, Tampa, Fla.

[\*\*] Term: **14 Years**

[21] Appl. No.: **27,249**

[22] Filed: **Aug. 16, 1994**

[52] **U.S. Cl.** ............................................................. **D21/214**

[58] **Field of Search** .................. D21/214; 273/167–175

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 146,431 | 3/1947 | Liolich | D21/214 |
| 4,065,133 | 12/1977 | Gordos | 273/167 E |
| 4,214,754 | 7/1980 | Zebelean | 273/167 H |

### OTHER PUBLICATIONS

Golf Smith; Oct. 1993; p. 3; "Designated Driver", top of page.

Florida Golf Warehouse; 1993; p. 4; "Sterling Trophy",

middle right of page.

*Primary Examiner*—Ted Shooman
*Assistant Examiner*—Mitchell I. Siegel

[57] **CLAIM**

The ornamental design for the golf club, as shown and described.

### DESCRIPTION

FIG. 1 is a perspective view of a golf club showing our new design, the broken away section of the shaft is due to an indeterminate length;

FIG. 2 is a front elevational view, shown without the shaft for ease of illustration;

FIG. 3 is a top plan view of FIG. 2;

FIG. 4 is a rear elevational view of FIG. 2;

FIG. 5 is a bottom plan view of FIG. 2;

FIG. 6 is a left end view of FIG. 2; and,

FIG. 7 is a right end view of FIG. 2.

**1 Claim, 2 Drawing Sheets**



EXHIBIT 21
Page 178

**U.S. Patent**          Nov. 7, 1995          Sheet 1 of 2          **Des. 363,961**



FIG.6

}FIG.1

FIG.7

EXHIBIT 21
Page 179

Case 8:10-cv-01198-CJC -RNB   Document 32-5   Filed 12/13/10   Page 31 of 68   Page ID #:383

**U.S. Patent**        Nov. 7, 1995        Sheet 2 of 2        **Des. 363,961**



FIG. 3

FIG. 2

FIG. 4

FIG. 5

EXHIBIT 21
Page 180

US00D372063S

# United States Patent [19]

## Hueber

[11] **Patent Number:** Des. 372,063

[45] **Date of Patent:** **∗∗Jul. 23, 1996**

[54] **GOLF CLUB HEAD**

[76] Inventor: **David Hueber,** 8208 Seven Mile Dr., Ponte Vedra, Fla. 32082

[∗∗] Term: **14 Years**

[21] Appl. No.: **25,656**

[22] Filed: **Jul. 7, 1994**

[52] **U.S. Cl.** ............................................. **D21/214**

[58] **Field of Search** .................. D21/214; 273/167–175

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,190,289 | 3/1993 | Nagai et al. ..................... 273/167 E |
| 5,397,126 | 3/1995 | Allen ................................. 273/172 X |

### OTHER PUBLICATIONS

Golf Digest; Jun. 1977; p. 118; "Rough Rider" Golf Club, upper left of page.

*Primary Examiner*—Terry A. Wallace

*Assistant Examiner*—Mitchell I. Siegel

*Attorney, Agent, or Firm*—Holland & Knight

[57] **CLAIM**

The ornamental design for a golf club head, as shown and described.

### DESCRIPTION

FIG. **1** is a perspective view of the golf club head showing my new design;

FIG. **2** is a front elevational view thereof;

FIG. **3** is a side elevational view taken from the right side thereof;

FIG. **4** is a rear elevational view;

FIG. **5** is a side elevational view taken from the left side thereof;

FIG. **6** is a top plan view thereof; and,

FIG. **7** is a bottom plan view thereof.

**1 Claim, 3 Drawing Sheets**



EXHIBIT 22
Page 181

**U.S. Patent**          Jul. 23, 1996          Sheet 1 of 3          **Des. 372,063**

## FIG. 1



## FIG. 2



EXHIBIT 22
Page 182

**U.S. Patent**          Jul. 23, 1996          Sheet 2 of 3          **Des. 372,063**

## FIG. 3



## FIG. 4



EXHIBIT 22
Page 183

**U.S. Patent**          Jul. 23, 1996          Sheet 3 of 3          Des. 372,063





*FIG. 7*



*FIG. 6*



*FIG. 5*

EXHIBIT 22
Page 184



US005456469A

# United States Patent [19]

## MacDougall

[11] **Patent Number:** **5,456,469**

[45] **Date of Patent:** **Oct. 10, 1995**

[54] **DYNAMICALLY STABILIZED GOLF CLUB**

[76] Inventor: **Alexander S. MacDougall**, 495 Valley Club Rd., Santa Barbara, Calif. 93108

[21] Appl. No.: **375,801**

[22] Filed: **Jan. 17, 1995**

[51] Int. Cl.$^6$ ................................................. A63B 53/04

[52] U.S. Cl. ................ 273/174; 273/167 H; 273/167 A; 273/175

[58] Field of Search .............................. 273/167 R, 168, 273/78, 169, 170, 171, 172, 173, 174, 175, 167 A, 167 B, 167 C, 167 D, 167 E, 167 F, 167 G, 167 H, 167 J, 167 K, 77 K, 77 A, 194 R, 187.4, 164.1, 186.2; D21/214, 215

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 355,686 | 2/1995 | Hlinka | D21/214 |
| 1,531,821 | 3/1925 | Scott | 273/167 A |
| 1,532,545 | 4/1925 | Pedersen | 273/175 |
| 1,619,566 | 3/1927 | Crankshaw | 273/174 |
| 2,023,885 | 12/1935 | Hinckley | 273/175 |
| 2,301,369 | 11/1942 | Carvill . | |
| 2,550,846 | 5/1951 | Milligan . | |
| 3,068,011 | 12/1962 | Sano | 273/174 |
| 3,761,095 | 9/1973 | Thompson . | |
| 3,815,921 | 6/1974 | Turner . | |
| 3,997,170 | 12/1976 | Goldberg . | |
| 4,043,563 | 8/1977 | Churchward . | |
| 4,332,388 | 6/1982 | Crow . | |
| 4,471,961 | 9/1984 | Masghati et al. . | |

| | | | |
|---|---|---|---|
| 4,489,945 | 12/1984 | Kobayashi . | |
| 4,795,159 | 1/1989 | Nagamoto . | |
| 5,013,041 | 5/1991 | Sun et al. . | |
| 5,050,879 | 9/1991 | Sun et al. . | |
| 5,125,662 | 6/1992 | Antonious . | |
| 5,154,423 | 10/1992 | Antonious | 273/167 A |
| 5,213,329 | 5/1993 | Okumoto et al. . | |
| 5,240,252 | 8/1993 | Schmidt et al. . | |
| 5,314,185 | 5/1994 | Gorman | 273/167 A |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0006733 | 1/1980 | European Pat. Off. . | |
| 0005407A1 | 5/1993 | European Pat. Off. . | |
| 405049715A | 3/1993 | Japan . | |
| 441593 | 1/1936 | United Kingdom | 273/174 |
| 2048693 | 12/1980 | United Kingdom . | |
| 2126906 | 4/1994 | United Kingdom . | |

### OTHER PUBLICATIONS

John W. Baymiller, "Straighter Shots From Curved Clubfaces," Golf Digest, 1965, 5 pages.

*Primary Examiner*—Sebastiano Passaniti
*Attorney, Agent, or Firm*—Marvin E. Jacobs

[57] **ABSTRACT**

A golf club, suitable as a driver or a wood, with a pair of elongated strakes on the bottom that extend back from the ball impacting surface in a converging pattern from locations astride the sweet spot so as to act as skid runners and also dynamically stabilize the sweet spot, reduce the gear effect, and generate longer and more accurate shots.

**9 Claims, 1 Drawing Sheet**



EXHIBIT 23
Page 185

**U.S. Patent**                    Oct. 10, 1995                    **5,456,469**



Fig. 1

Fig. 2.

Fig. 3.

EXHIBIT 23
Page 186

5,456,469

1

**DYNAMICALLY STABILIZED GOLF CLUB**

### TECHNICAL FIELD

This invention relates to the sport of golf, and more specifically golf club heads that are designed to yield consistent, accurate, and predictable performance.

### BACKGROUND OF THE INVENTION

When a golf club head strikes a golf ball slightly off center, that is, not directly in line with the center of gravity of the head, a spin is induced in the ball causing the ball to curve in flight. This effect is known as the gear effect and is thoroughly explored in U.S. Pat. No. 4,471,961 to Masghati et al. In essence, the off center impact of the ball causes the head to rotate about its center of gravity and this rotation, or spin, is transferred into the golf ball, like two gears meshing, so that the ball spins in the opposite direction. Spinning balls curve as they fly through the air.

In order to compensate for this adverse spin, golf club heads have convex curved impact surfaces, known as bulge, that intentionally deflect the ball sideways by increasing amounts for progressively further off center hits so that the inevitable curve will bring the ball roughly back to the desired path in line with the direction of the club swing. This compensation is approximate at best, and many prior art solutions have been attempted to minimize the gear effect.

The Masghati et al patent, for example, proposes weights in the head at locations far from the rotational axis so as to maximize the rotational inertia and, thus, resist head rotation. But trying to diminish head rotation in this manner is inherently limited because head weights are established at about 200 grams and even if nearly all of this weight is near the edge, the head will still twist in response to off center ball strikes.

Another problem in maintaining accuracy with convex impact surfaces is that all materials have some degree of elasticity. Hence, no matter what material a golf club head is made from, it will elastically deform from the impact of the ball so that the actual shape of the bulge is never fully predictable. It follows that the intentional misdirection of the ball, to compensate for spin, is also somewhat unpredictable. This temporary shape change may also affect the efficiency of the spin transfer to the ball, and, consequently, the magnitude of the gear effect. Modern club heads are typically constructed from a thin metal shell that is filled with a fairly stiff plastic foam. This produces a very durable, and very strong, head with a naturally high rotational moment of inertia. However, the head is still a highly dynamically flexible object which must necessarily yield and bend a bit upon impact. If it did not yield, that is, was very hard, it would be, by definition, brittle and would likely shatter on impact.

The discussion above concerns the technology surrounding the very long driving of balls and thus pertains more to drivers and the first shot off a well prepared tee. Once on the fairway, other problems arise as well, although distance may still be required. In this situation, golfers often switch from a driver to a so called wood, which may, in modern practice, be made from metal, wood, or plastics. To facilitate use of the club in taller grass, or in the rough, another class of prior art designs has emerged that use skids or strokes on the bottom surface, or sole, of the club head. These skids slide over or through the ground and keep the bulk of the bottom surface of the head from digging into the ground and grass

2

and, thus, losing momentum. Typical prior art in this class is found in U.S. Pat. Nos. 4,332,388 to Crow, 5,213,329 to Okumoto et al, 5,125,662 to Antonious, 3,761,095 to Thompson, and 3,815,921 to Turner. All of these patents show various kinds of skids or runners on the bottom of the head intended to help the head track smoothly and more easily over the surface of the ground. All of these patents also require that the skids be parallel to the direction of movement of the head or swing. Crow, for example, says in column 3, line 32, that his parallel runners stabilize and track the head when it contacts the ground. Okumoto states that his skids extend in a back and forth direction relative to the direction of swing of the club. Antonious says in column 2, line 6, that his skid members have their longitudinal axis extending in the front to rear direction so as to furrow into the ground and prevent lateral club head movement (column 2, line 53). Thompson recites in column 2, that his so called keel 30 extends along a line that will be the path of swing of the head, line 53). Finally, Turner says that his keel is normal to the striking face in column 1, line 36. Clearly, it is the firm opinion in the art that strakes on the club head must be parallel to the swing path to avoid sideways deflections of the club upon ground contact. The present invention contemplates a complete reversal of this orthodoxy in order to achieve not only the benefits of skids, but also the taming of the gear effect, as explained below.

### STATEMENT OF THE INVENTION

Briefly, this invention utilizes skids or strakes on the bottom of the club head that are not parallel to the swing direction, or to each other, but rather converge as they extend back from the bulge toward the rear of the head. It has been discovered that this arrangement provides numerous unexpected advantages. Firstly, no lateral deflections are induced by ground contact since each of the dual strakes are angled in opposite directions from the swing path and, therefore, cancel each other out. However, the strakes still keep the head from the digging into the ground and losing momentum. Secondly, the strakes brace the bulge at critical locations along its length near the ends of the effective strike zone and carry the impact forces back toward the center of gravity of the head. Thus, the bulge is more rigid, where it counts, so that the gear effect compensation is less affected by dynamic flexing and, accordingly, more consistent and predictable. In time, a golfer using this head can learn to be more accurate because the club head does the same thing every time, rather than dynamically bending and changing behavior for different force ball impacts. The head of the present invention is dynamically stabilized and generates more consistent, predictable, and repeatable performance.

The rigidized bulge rebounds faster, and propels the ball away more quickly for off center hits, because it is reinforced by the strakes at the off center locations. Hence, the ball spends less time in contact with the head. There is less time for spin transfer and therefore less gear effect. Since less spin is induced, less energy is absorbed by spin, leaving more energy to drive the ball further, a necessary consequence of the principle of conservation of energy.

The strakes are fairly massive compared to the thin shell of the head and, thus, add weight at a low location and at a forward location. The low location weight increases inertia and driving power. The forward location weight moves the center of gravity of the head forward, nearer the bulge. The gear effect rotates the head about the center of gravity. But since this center is now closer to the bulge, at a lesser radius,

EXHIBIT 23
Page 187

5,456,469

**3**

the sideways movement of the bulge is lessened, decreasing the gear effect.

As a result of all these above advantages, a club head is provided that is both a good driver and a good wood. The golfer can use the same club for both purposes which enhances learning and skill. Having to change clubs often makes it harder to become consistent and repeatable, harder to get in the groove, as the saying goes. Additional advantages and benefits will become apparent in the following detailed description and the drawings referenced thereby.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side elevational view of the golf club head of the present invention as seen from the ball impacting, or bulge, face side, showing the bottom strakes extending back from the bulge, the strakes visible, more or less, end on;

FIG. 2 is a bottom view of the head showing how the strakes begin at the bulge and extend back toward the rear, converging generally toward the center of the head and diminishing in size toward the rear so as to move the center of gravity forward toward the bulge; and

FIG. 3 is a fragmentary sectional view of the club head, oriented as in FIG. 1, showing that the head comprises a thin metal shell filled with a reinforcing plastic foam.

### DETAILED DESCRIPTION OF THE INVENTION

FIGS. 1 and 2 show the inventive golf club head **10** with an impact surface or bulge **12** and a hosel **14** connected to a shaft **16**. The radius of bulge **12** is typically about ten inches. The bulge is the curve over the left to right distance in FIG. 2 and is designed to compensate for the gear effect induced ball spin that curves the ball left and right when struck off center, either toward the heel **18**, or the toe **20**. Heads also have a curve in the impact surface **12** that is orthogonal to the bulge and referred to as the roll. The roll compensates for high and low strikes in the same manner as the bulge offsets left and right strikes, although the effect is less in terms of accuracy.

There are limits to the width of the effective contact zone, sometimes called a sweet spot, which are represented, for the purpose of the drawing, with numerals **22** and **24** which identify the approximate boundaries of the effective contact zone.

Two strakes **26** and **28** extend back from the bulge, from locations approximately near the boundaries **22** and **24** of the sweet spot, converging toward the center of the head and toward its center of gravity. Strakes **26** and **28** comprise elongated projections or bumps that serve as skids or runners to facilitate head motion in grass or in the rough. However, they decrease in size as they extend rearward so as to keep the preponderance of the mass forward near the bulge and relocate the center of gravity forward which decreases the gear effect. The strakes also lower the center of gravity, generally considered to add distance and power to the ball strike.

The strakes **26** and **28** are not necessarily in line with the swing path, or parallel to each other, as in the prior art. But since they diverge from the swing path in opposite direc-

**4**

tions, any lateral deflections caused by the strakes digging into the ground are cancelled out and do not generate directional errors.

As may be seen in FIG. 3, head **10** comprises a very thin stainless steel metal shell **29** filled with a suitable reinforcing plastic foam **30**. The strakes **26** and **28** may be made from a thicker metal, as shown at **32**, if desired, so as to have a greater mass and strength. The foam filled shell is dynamically quite flexible, which makes it strong and tough under impact. But ball impacts that are off center also encounter very complex deflections that vary as a function of location, force, and other environmental conditions. These deflections produce hard to predict, variable, inconsistent compensations to the gear effect that make it harder for a golfer to learn the behavior of the club head. The strakes of the present invention significantly reduce these variables by rigidizing the bulge **12** at the approximate boundaries **22** and **24** of the sweet spot.

Strakes **26** and **28** capture and resist most of the ball impact force and convey it back toward the center of gravity. Since the strakes are positioned generally perpendicular to the ends **22** and **24** of the effective contact zone, they are very stiff and strong. Other parts of the bulge yield more easily and, thus, retreat from the ball impact, leaving the strakes to absorb the brunt of the force. Thus, the force is directed along the length of the strakes and into the center of gravity of the head. The shape of the bulge is better preserved, and the compensation for the gear effect is more consistent.

The more rigid bulge at the edges of the sweet spot rebound the ball quicker so that spin transfer is reduced and more energy is transferred as momentum. The gear effect is reduced as a result of the reduced spin transfer.

The present invention provides a club head with more power, more accuracy, more consistency, and less gear effect. This has been confirmed by many users who have tried the club and report a better feel, straighter shots, more distance, and less variability. The head permits use as both a driver and a wood so that the need to change clubs and relearn the correct swing is lessened. The principles of the invention, and the converging bottom strakes, are equally applicable to any type of club head, or head construction method. We intend, therefore, that the invention be limited only in accordance with the appended claims and their equivalents.

I claim:

1. A golf club head having a ball impact bulge face having an effective contact zone thereon defined by opposite ends and having a bulge face edge adjacent a bottom surface of said club head and said bottom surface having elongated strakes thereon extending back from the bulge face edge, said strakes converging toward each other as they extend away from the bulge face bulge, whereby said strakes serve to both reduce the lateral deflection of said club head upon contact thereof with the ground and brace the bulge face adjacent the ends of the effective contact zone.

2. The head of claim **1** in which there are two of said strakes.

3. The head of claim **1** in which said strakes diminish in size as they extend back from the bulge face edge.

4. The head of claim **1** in which said strakes converge

EXHIBIT 23
Page 188

5,456,469

5

generally toward the center of gravity of the head.

5. The head of claim 1 in which the strakes extend back from the bulge face edge from locations near the ends of the effective contact zone.

6. The head of claim 1 in which the head comprises a thin metal shell filled with a reinforcing plastic foam.

7. The head of claim 2 in which the strakes diminish in size as they extend back from the bulge face edge.

6

8. The head of claim 7 in which the strakes extend back from locations approximately at the ends of the effective contact zone.

9. The head of claim 8 in which the head comprises a thin metal shell filled with reinforcing foam.

* * * * *

EXHIBIT 23
Page 189

Westlaw.

Slip Copy, 2010 WL 625220 (N.D.Ill.)
**(Cite as: 2010 WL 625220 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Yoon Ja KIM, Plaintiff,
v.
The EARTHGRAINS CO., k/n/a Sara Lee Bakery
Group, Inc., Defendant.
**No. 01 C 3895.**

Feb. 18, 2010.

West KeySummary
**Patents 291 ☜319(1)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k319 Damages
        291k319(1) k. In General. Most Cited
Cases
Patent holder failed to establish that the scope of
her patent was unchanged when it was changed on
reexamination from "consisting of" to "consisting
essentially of." The alleged patent infringer argued
that changing the transitional from "consisting es-
sentially of" to "consisting of" narrowed the scope
and was, thus, a substantive change that would limit
the recovery of damages. The patent holder's ori-
ginal patent covered potassium bromate replacer
formulas that contained other non-postassi-
um-bromate bread strengthening agency as well as
ascorbic acid, food acid, and flour, as long as the
other ingredients did not change or reduce the for-
mula's function. However the strengthening agents
would not fall under a "consisting of" claim unless
the bread strengthening agents were totally unre-
lated to the invention or were unavoidable impur-
ities of the listed ingredients.

Gary Edward Hood, Nicole Ellison Lammers, Mc-
Donnell Boehnen Hulbert & Berghoff LLP, Chica-

go, IL, for Plaintiff.

Bryan K. Wheelock, Harness, Dickey & Pierce, St.
Louis, MO, Craig Christopher Martin, Eric Andrew
Sacks, Olivia T. Luk, Sara Elizabeth Tonnies,
Steven Raymond Trybus, Jenner & Block LLP,
Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SUSAN E. COX, United States Magistrate Judge.

**\*1** Defendant The Earthgrains Co., k/n/a Sara Lee
Bakery Group Inc. ("defendant") has moved this
Court for partial summary judgment against
plaintiff Yoon Ja Kim ("plaintiff"), pursuant to
Federal Rule of Civil Procedure 56(c). Defendant's
motion requests that the applicable damages period
begin on March 31, 2009, the date when the Reex-
amination Certificate for plaintiff's patent was is-
sued. For the reasons set forth below, the Court
grants defendant's motion and enters partial sum-
mary judgment in favor of defendant [dkt 220].

**I. Background**

Unless stated otherwise, the following facts are un-
disputed and are taken from the Plaintiff's Response
to Defendant's Local Rule 56 .1 Statement of Facts.
[FN1] On October 26, 1999, the United States Patent
and Trademark Office ("USPTO") issued U.S. Pat-
ent No. Re 36,355 (the "original patent") to
plaintiff for a potassium bromate replacer.[FN2] Po-
tassium bromate is used as an oxidizing agent in
commercial breadmaking; it strengthens the dough
and increases the volume of the finished bread, res-
ulting in better-textured bread.[FN3] However, po-
tassium bromate has been banned in California, and
a market for potassium bromate replacers has aris-
en.[FN4] Plaintiff's original patent contained several
claims, each detailing a particular formula for a po-
tassium bromate replacer based on ascorbic acid

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 24
Page 190

Slip Copy, 2010 WL 625220 (N.D.Ill.)
**(Cite as: 2010 WL 625220 (N.D.Ill.))**

and another food acid selected from a list.[FN5] Specifically, claim 5 of plaintiff's original patent stated:

> FN1. Citations to the record are as follows: Plaintiff's Exhibits in Support of Response to Defendant's Statement of Material Facts are PR Ex. ___; Plaintiff's Exhibits in Support of Statement of Additional Material Facts are cited as PSOF Ex. ___; Defendants' Exhibits in Support of Motion for Summary Judgment are cited as Def. Ex. ___; and Plaintiff's Exhibits in Support of Response to Defendants' Motions for Summary Judgment are cited as Pl.Ex. ___.

> FN2. PR ¶ 10.

> FN3. U.S. Patent Re. 36,355 (filed May 14, 1996) col.1 l.22-40, Def. Ex. C 3.

> FN4. U.S. Patent Re. 36,355 (filed May 14, 1996) col.2 l.11-24, Def. Ex. C 3.

> FN5. U.S. Patent Re. 36,355 (filed May 14, 1996) col.8 l.47-col.10 l .14, Def. Ex. C 6, 7.

A potassium bromate replacer composition *consisting essentially of,* by weight: (a) about 0.001 to 0.03 parts ascorbic acid as an oxidant per 100 parts flour, (b) about 0.015 to 0.2 parts food acid per 100 parts flour, said food acid selected from the group consisting of acetic acid, citric acid, fumaric acid, lactic acid, malic acid, oxalic acid, phosphoric acid, succinic acid, tartaric acid, fruit juice, fruit juice concentrate, vinegar, wine, and mixtures thereof, and (c) flour.[FN6]

> FN6. U.S. Patent Re. 36,355 (filed May 14, 1996) col.8 l.47-57, Def. Ex. C 6, 7 (emphasis added).

Claims 6-8 are dependent on claim 5 and added additional specifications to the formula. Claim 10 of the original patent read as follows:

A potassium bromate replacer composition *con-*

*sisting essentially of,* by weight: (a) about 0.001 to 0.03 parts ascorbic acid as an oxidant per 100 parts flour, (b) about 0.015 to 0.2 parts food acid per 100 parts flour, said food acid selected from the group consisting of acetic acid, citric acid, fumaric acid, lactic acid, malic acid, oxalic acid, phosphoric acid, succinic acid, tartaric acid, fruit juice, fruit juice concentrate, vinegar, wine and mixtures thereof, (c) about 0.5 parts yeast food per 100 parts flour, and (d) flour.[FN7]

> FN7. U.S. Patent Re. 36,355 (filed May 14, 1996) col.10 l.1-14, Def. Ex. C 7 (emphasis added).

In 2001 Kim filed separate patent infringement suits against Dawn Food Products, Inc. ("Dawn"), ConAgra Foods, Inc. ("ConAgra"), and defendant. In the suit against Dawn, the district court (Judge St. Eve) granted summary judgment to Dawn in 2004 after determining that Dawn's breads did not contain ascorbic and other food acids in amounts that fell within the ranges of the original patent; the court did not examine the patent's validity.[FN8] In the suit against ConAgra, which went to trial in 2003, a jury did not find the original patent to be invalid and found that ConAgra's Healthy Choice Seven Grain and Whole Grain breads infringed upon claim 10 of the patent; the district court (Judge Hart) vacated the jury finding of infringement for insufficient evidence but upheld the validity finding.[FN9] ConAgra appealed the validity finding, but in 2006 the Federal Circuit affirmed that ConAgra had not proven the original patent to be invalid.[FN10]

> FN8. *Kim v. Dawn Food Products, Inc.,* No. 01 C 1906, 2004 WL 2658068 (N.D.Ill.2004).

> FN9. *Kim v. ConAgra Foods, Inc.,* No. 01 C 2467, 2005 WL 1311597 (N.D.Ill.2005).

> FN10. *Kim v. ConAgra Foods, Inc.,* 465 F.3d 1312 (Fed.Cir.2006).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 24
Page 191

Slip Copy, 2010 WL 625220 (N.D.Ill.)
**(Cite as: 2010 WL 625220 (N.D.Ill.))**

*2 In the case against defendant for use of plaintiff's formulas in "Buttertop", "D'Italiano", and "Healthy Choice" breads, the district court (Judge Zagel) found in 2002 that the original patent was invalid because of prior art, specifically, the pre-filing composition of "Buttertop" bread.[FN11] The Federal Circuit reversed that ruling in 2003 after noting evidence that earlier versions of "Buttertop" bread contained potassium bromate and Sara Lee had failed to prove that the composition of "Buttertop" bread had been changed before the issuance of the original patent.[FN12] The Federal Circuit reasoned that because the original patent is for a potassium bromate replacer, a bread formula containing both the ingredients listed in the original patent and potassium bromate would not be using the patent ingredients as a potassium bromate replacer.[FN13] The case was then remanded to this Court.

> FN11. *Kim v. Earthgrains Co.,* No. 01 C 3895, 2002 WL 1949235 (N.D.Ill.2002).

> FN12. *Kim v. Earthgrains Co.,* 60 Fed. Appx. 270 (Fed.Cir.2003).

> FN13. *Id.* at 274.

On August 17, 2005, while its appeal to the Federal Circuit was pending, ConAgra requested an *ex parte* reexamination of the original patent.[FN14] In its formal request, ConAgra argued that prior art, including U.S. patent No. 2,149,682 (the "Jorgenson patent") and U.S. patent No. 5,338,552 (the "Nasu patent"), rendered claim 5, its dependent claims, and claim 10 unpatentable.[FN15] The Jorgenson patent is for a method of improving bread strength by adding 1 to 5 liters of lemon juice for every 100 kilograms of flour. ConAgra asserted that the resulting concentrations of ascorbic acid and citric acid overlapped with claims 5 and 10's specifications for ratios of ascorbic acid, another food acid, and flour.[FN16] It also noted that the Nasu patent called for adding ascorbic acid and another food acid to bread dough in ratios similar to those listed in claims 5 and 10 of plaintiff's original

patent.[FN17] Examiner Stephen J. Stein ("Examiner") agreed that the Jorgenson and Nasu patents rendered claim 5 unpatentable but rejected other patents ConAgra had suggested as prior art.[FN18]

> FN14. Request for *ex parte* reexamination transmittal form, August 17, 2005, PSOF Ex. 1-2.

> FN15. Request for reexamination, May 14, 1996, Def. Ex. D 7.

> FN16. *Id.* at 8, 9.

> FN17. *Id.* at 11.

> FN18. Office action in *ex parte* reexamination, July 5, 2006, Def. Ex. F 3-6.

Plaintiff filed several appeals with the USPTO to challenge Examiner's decision. To argue that the Jorgenson patent was not invalidating prior art, plaintiff recalculated the acid content of lemon juice and found that while the amounts of ascorbic acid and citric acid were within claim 5's range, the lemon juice also contained enough malic acid to raise the total non-ascorbic acid levels in Jorgenson's formula above those in plaintiff's patent.[FN19] She also noted that the Nasu patent called for the ascorbic acid and other food acid to be put into the bread dough at different times, which did not make the ascorbic acid into a slow-acting oxidant and, thus, did not anticipate her invention.[FN20]

> FN19. Appeal Brief, May 19, 2008, Def. Ex. P 15, 19.

> FN20. Def. Ex. P at 22.

On December 24, 2008, plaintiff and Examiner conducted a telephone interview during which plaintiff consented to changing the transitional phrase in claims 5 and 10 from "consisting essentially of" to "consisting of."[FN21] Plaintiff also consented to incorporate claim 6 into both claims by adding the language "wherein said food acid is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 24
Page 192

Page 4

Slip Copy, 2010 WL 625220 (N.D.Ill.)
(Cite as: 2010 WL 625220 (N.D.Ill.))

present in an effective amount that slows down oxidation of ascorbic acid to dehydroascorbic acid during a manufacturing process of yeast-leavened products" to both claims, and she agreed to delete the separate claim 6.[FN22] Examiner's notes show he believed that these amendments were necessary to exclude the additional food acids found in the Jorgenson patent and the additional components of bread dough found in the Nasu patent.[FN23] Examiner then issued an *ex parte* Reexamination Certificate on March 31, 2009.[FN24]

> FN21. *Ex parte* reexamination interview summary, December 24, 2008, Def. Ex. Q 3.

> FN22. *Ex parte* reexamination interview summary, December 24, 2008, Def. Ex. Q 3.

> FN23. Notice of intent to issue *ex parte* reexamination certificate, *December* 30, 2008, Def. Ex. R 7.

> FN24. *Ex parte* reexamination certificate, March 31, 2009, Def. Ex. S 3.

*3 With the patent now declared valid by the USPTO, plaintiff's case against defendant was finally able to proceed. On December 14, 2009, however, because of the change in the patent language, defendant filed the present motion requesting a limited damages period.

**II. Legal Standard**

On a motion for summary judgment, disputed facts must be viewed in the light most favorable to the nonmoving party.[FN25] However, when there is no way the record as a whole could lead a rational trier of fact to find for the nonmoving party, the court should grant summary judgment.[FN26] Thus, to prevail on a motion for summary judgment, a party must present evidence that demonstrates that no material facts are at issue in the case.[FN27] An issue of fact is material when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."[FN28]

> FN25. *Ricci v. DeStefano,* --- U.S. ----, ----, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009), *citing* Fed.R.Civ.P. 56(c).

> FN26. *Ricci,* 129 S.Ct. at 2677.

> FN27. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> FN28. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If a party has the burden of proving an essential element in trial, that party also has the burden of making a showing sufficient to establish the existence of that element on a motion for summary judgment.[FN29] Plaintiff has the burden of proving patent infringement at trial and thus has the burden of proving the possibility of patent infringement to avoid summary judgment.[FN30] Furthermore, the patent-holder has the burden to establish the reason for amendments made during patent prosecution.[FN31] If a substantive change is made to a patent claim during reexamination, the patent owner can only recover damages from the date the Reexamination Certificate was issued.[FN32] To determine whether or not substantive changes have been made, the Court must determine whether or not the scope of the claim has changed.[FN33] It is insufficient to show merely that the patent language has been changed.[FN34]

> FN29. 477 U.S. at 322.

> FN30. *Applied Medical Resources Corp. v. U.S. Surgical Corp.,* 448 F.3d 1324, 1333 (Fed.Cir.2006).

> FN31. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 33, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 24
Page 193

Slip Copy, 2010 WL 625220 (N.D.Ill.)
**(Cite as: 2010 WL 625220 (N.D.Ill.))**

> FN32. *Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1346 (Fed.Cir.1998).

> FN33. *Laitram,* 163 F.3d at 1346.

> FN34. *Id.*

Transitional phrases, including "comprising," "consisting essentially of," and "consisting of" define the limits of a claim .[FN35] "Consisting essentially of" is commonly used to signal a partially open claim in a patent; that is, the invention must include the listed ingredients and may also include unlisted ingredients which do not materially affect the basic and novel properties of the invention, even if additional ingredients are excluded from illustrative examples.[FN36] An ingredient materially affects basic and novel characteristics of an invention if the ingredient's effect is "of consequence to those of ordinary skill in the art." [FN37] In contrast, "consisting of" is used to signal a closed claim; the invention is limited to the elements listed in the claim as well as elements unrelated to the invention and unavoidable impurities.[FN38]

> FN35. *PPG Industries v. Guardian Industries Corp.,* 156 F.3d 1351, 1354 (Fed.Cir.1998).

> FN36. *Ecolab, Inc. v. FMC Corp.,* 569 F.3d 1335, 1343-44 (Fed.Cir.2009) (rehearing on unrelated issues granted in part September 30, 2009).

> FN37. *PPG,* 156 F.3d at 1355.

> FN38. *Norian Corp. v. Stryker Corp.,* 363 F.3d 1321, 1331 (Fed.Cir.2004) (rehearing *en banc* denied); *Ex parte Davis;* 80 U.S.P.Q. 448, 450 (Pat.Off.Bd.App.1949).

## III. Analysis

Defendant alleges that the March 31, 2009 change in transitional phrase from "consisting essentially of" to "consisting of" narrowed the scope of claims

5 and 10 and was, thus, a substantive change. If this is true, the applicable damages period should start on March 31, 2009.[FN39] Plaintiff, however, argues that the change from "consisting essentially of" to "consisting of" did not narrow the patent's claim but instead clarified the original patent. She argues, based on her own experiments, that a person of ordinary skill in the art of breadmaking would not recognize a change in the scope of the claims. Plaintiff also argues that Examiner's changes to the patent were unnecessary to make the claims valid.

> FN39. 163 F.3d at 1346.

**\*4** As noted, the transitional phrases in claims 5 and 10 were changed from "consisting essentially of" to "consisting of." This means that the class of additional elements which may be added to the inventions in claim 5 or claim 10 has been changed from "elements which do not materially affect the basic and novel properties of the invention" to "elements which are unrelated to the invention or are unavoidable impurities." [FN40] Plaintiff asserts that these classes are identical and cites her research, which found that adding water (the "additional element" at issue in *Nasu* ), azodicarbonamide (ADA), and various other ingredients, did not affect the functioning of her formula.[FN41] However, she does not offer sufficient evidence to support a finding that the two classes are the same. In other words, plaintiff has not shown that any element barred under her current "consisting of" claims would have been barred under her previous "consisting essentially of" claims.

> FN40. *Ecolab,* 569 F.3d at 1343-44; *PPG,* 156 F.3d at 1355; *Norian,* 363 F.3d at 1331.

> FN41. Declaration of Yoon Ja Kim in support of opposition to defendant's motion, January 8, 2010, P Ex. 1: 9, 10, 18.

Furthermore, the Federal Circuit has previously ruled that elements that do not materially affect the basic and novel properties of an invention may still

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 24
Page 194

Slip Copy, 2010 WL 625220 (N.D.Ill.)
(Cite as: 2010 WL 625220 (N.D.Ill.))

be related to the invention. In *Ecolab, Inc. v. FMC Corp.*, FMC Corporation ("FMC") claimed that Ecolab, Incorporated ("Ecolab") infringed upon claims of FMC's method patent for sanitizing poultry.[FN42] The claims all contained the phrase "contacting the fowl with an aqueous peracetic acid solution, which consists essentially of a sanitizing concentration of at least a 100 ppm peracetic acid."[FN43] Ecolab's poultry sanitizing solution contained two other antimicrobial acids as well as peracetic acid; the three acids had a synergistic effect on each other.[FN44] A jury found that Ecolab had infringed upon the patent.[FN45] In response, Ecolab motioned for judgment as a matter of law and argued that "consisting essentially of" limited the invention to solutions which contained peracetic acid as the sole antimicrobial agent, especially because all examples in the patent used peracetic acid as the sole antimicrobial.[FN46] The Federal Circuit found this argument unpersuasive and affirmed the district court's dismissal of Ecolab's motion.[FN47]

> FN42. 569 F.3d at 1342.
>
> FN43. *Id.*
>
> FN44. 569 F.3d at 1342.
>
> FN45. *Id.*
>
> FN46. 569 F.3d at 1342-43.
>
> FN47. *Id.* at 1344.

The Federal Circuit's construction of "consisting essentially of" in *Ecolab* implies that a formula which falls under a "consisting essentially of" claim may contain additional "active" ingredients not listed in the claim, as long as the additional active ingredients do not materially alter the "basic and novel" characteristics of the invention. *Ecolab* also suggests that additional active ingredients which improve the performance of the basic claim formula, but do not otherwise change its function, do not materially alter the "basic and novel" characteristics of the invention. Taken together, this means that in the present case, claims 5 and 10 in plaintiff's

original patent may have covered potassium bromate replacer formulas that contained other non-potassium-bromate bread strengthening agents as well as ascorbic acid, food acid, and flour (as well as yeast food for claim 10 formulas) as long as the other ingredients did not change or reduce the formula's function. However, these hypothetical formulas containing other bread strengthening agents would not fall under a "consisting of" claim unless the bread strengthening agents were totally unrelated to the invention or were unavoidable impurities of the listed ingredients. A bread strengthener, which improves the invention's function or further improves bread strength or volume, is not unrelated to the invention's qualities. It, rather, improves on the invention. Furthermore, plaintiff has not argued that bread strengthening agents are impurities commonly found in commercially available ascorbic acid, food acid, flour, or yeast food. Thus, there are potential formulas for bread strengtheners that meet the requirements of the original claims but not the requirements of the amended claims. This discrepancy indicates that plaintiff's claims have been narrowed.

*5 Plaintiff argues that "consisting of" may have a broader meaning than commonly thought. Plaintiff claims that *Norian Corp. v. Stryker Corp*[FN48], in which "consisting of" did not exclude a spatula from a dental repair kit, implies that additional ingredients may be added to a "consisting of" claim. However, *Norian* explicitly states that "[c]onsisting of, as used in claim 8 limits the kit to the claimed chemicals and no other chemicals."[FN49] The Federal Circuit did not make exceptions for chemicals that had no material effect on the formula.[FN50] This implies that a "consisting of" claim that is a chemical formula cannot contain additional chemicals. Thus, plaintiff's claims 5 and 10, as presently written, cannot contain additional chemical ingredients, including additional bread strengtheners.

> FN48. 363 F.3d at 1331.
>
> FN49. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 24
Page 195

Slip Copy, 2010 WL 625220 (N.D.Ill.)
**(Cite as: 2010 WL 625220 (N.D.Ill.))**

FN50. *Id.*

Plaintiff also argues that *Conoco, Inc. v. Energy & Environmental International, L.C.* allows for further expansion of the phrase "consisting of" to include additional chemicals.[FN51] In *Conoco,* the Federal Circuit affirmed a district court ruling that a water-alcohol mixture also containing MIBK, a common additive to industrial alcohols, was within the scope of the claim component "a suspending material selected from the group consisting of water and water-alcohol mixtures."[FN52] However, MIBK is regularly added to industrial alcohols in order to exempt it from liquor taxes, and persons of ordinary skill in the field would recognize that commercially sold industrial alcohol often contains MIBK.[FN53] This fits within the accepted meaning of "consisting of" allowing for small impurities in the listed ingredients, although it clarifies the meaning by establishing that artificially-added impurities are also allowed if a person of ordinary skill in the art would be aware that the listed ingredients often contained such impurities. Plaintiff has not asserted what, if any, impurities or additives are present in commercially sold ascorbic acid, food acid sources, flour, or yeast food beyond the non-acidic components of the food acid sources listed in the claim. The phrase "consisting of" is simply not broad enough under current case law to encompass the scope of plaintiff's previous claims which used "consisting essentially of."

FN51. 460. F.3d 1349, 1360-61 (Fed.Cir.2006) (rehearing *en banc* denied).

FN52. 460 F.3d at 1360-61.

FN53. *Id.*

Therefore, plaintiff has not established that the scope of claims 5 and 10 remained unchanged when the claim was amended on March 31, 2009. Because she has failed to establish that her original patent is substantially identical to her reissued patent, the Court grants summary judgment in favor of defendant.

## IV. Conclusion

For the foregoing reasons the Court grants Defendant's Motion for Partial Summary Judgment on Applicable Damages Period [dkt 220].

IT IS SO ORDERED.

N.D.Ill.,2010.
Kim v. Earthgrains Co.
Slip Copy, 2010 WL 625220 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 24
Page 196

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 144405 (S.D.Cal.)
**(Cite as: 2010 WL 144405 (S.D.Cal.))**

**H**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. California.
I-FLOW CORPORATION, a Delaware corporation, Plaintiff,
v.
APEX MEDICAL TECHNOLOGIES, INC., a California corporation, et al., Defendants.
and All Related Counterclaims.
**No. 07cv1200 DMS (NLS).**
**Docket No. 449.**

Jan. 12, 2010.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON INTERVENING RIGHTS**

DANA M. SABRAW, District Judge.

*1 This matter comes before the Court on Defendants' motion to recognize intervening rights under 35 U.S.C. §§ 252 and 307(b). Plaintiff filed an opposition to the motion. Reply briefs were not permitted. For the reasons set out below, the Court grants Defendants' motion.

**I.**

**FINDINGS OF FACT**

1. United States Patent Number 5,284,481 ("the '481 Patent") issued on February 8, 1994. (Decl. of Boris Zelkind in Supp. of Pl.'s Opp'ns to Mots. (Zelkind Decl."), Ex. 17.)

2. Claim 1 of the '481 Patent provides:

A compact portable apparatus for dispensing a

liquid under pressure at a substantially constant flow rate over a period of time comprising:

an elongated generally cylindrical support member;

elongated elastic sleeve means mounted and sealingly secured at fixed spaced longitudinal positions on said support member for defining a substantially zero non-pressurized volume pressure reservoir for holding a liquid in a pressurized state for dispensing therefrom;

housing means comprising collapsible non-stretchable housing means for containing said support member and said pressure reservoir for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member;

inlet means for introducing a liquid into said elastic pressure reservoir; and outlet means for dispensing liquid from said pressure reservoir to a selected site.

(*Id.* at 162.)

3. Claim 15 of the '481 Patent recites:

A compact collapsible infusion apparatus for dispensing a liquid under pressure at a predetermined substantially constant flow rate over a period of time comprising:

an elongated generally cylindrical support member having inlet means including an inlet port in one end of said member, and outlet means including an outlet port in the other end of said member;

elongated elastic sleeve means mounted in non-stretched surface contact and sealingly secured at fixed space longitudinal positions on said support member for defining a substantially zero non-pressurized volume pressure reservoir for holding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 25
Page 197

Not Reported in F.Supp.2d, 2010 WL 144405 (S.D.Cal.)
(Cite as: 2010 WL 144405 (S.D.Cal.))

a liquid in a pressurized state for dispensing therefrom;

first housing means including a collapsible shell enclosing said support member and said pressure reservoir, said housing having a size and shape for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member;

inlet means in one end of said support member for introducing a liquid into said elastic pressure reservoir; and

outlet means in the other end of said support member for dispensing liquid from said pressure reservoir to a selected site.

(*Id.* at 163.)

4. On November 12, 2007, Defendants filed an *ex parte* request for reexamination of the '481 Patent with the Patent and Trademark Office ("PTO").

5. The PTO granted Defendants' request for reexamination on January 16, 2008.

6. On September 29, 2008, the PTO issued an Office Action rejecting all claims of the '481 Patent as anticipated by European Patent Application Number 90311152.4 ("Block Medical").[FN1] (Decl. of Trevor Coddington in Supp. of Mots. ("Coddington Decl."), Ex. L.)

> FN1. Block Medical, Inc. was the applicant for the European Patent, and was the original assignee of the '481 Patent. Plaintiff acquired Block Medical, Inc. in 1996, and is now the owner by assignment of both the '481 Patent and the Block Medical Patent.

*2 7. Plaintiff's counsel thereafter participated in an interview with three examiners from the PTO concerning the reexamination. (Coddington Decl., Ex. M.)

8. The Interview Summary reflects that counsel and the examiners discussed claims 1, 15 and 23 "with respect to the prior art of record." (*Id.*) The Summary also reflects that counsel presented amended claim language concerning the housing element "having a loose fit over the elastic sleeve means and a chamber surrounding the elastic sleeve means. This language was generally agreed to define over the art, subject to further consideration." (*Id.*)

9. On November 20, 2008, Plaintiff's counsel submitted to the PTO a written response to the September 29, 2008 Office Action that formally amended the claims to indicate the housing element is "loosely positioned around said sleeve means and defining a chamber between said sleeve means and said collapsible non-stretchable housing means." (Coddington Decl., Ex. N.)

10. On April 22, 2009, the PTO issued a Notice of Intent to Issue Ex Parte Reexamination Certificate ("Certificate") in which it indicated that the amended claims were no longer anticipated by Block Medical, and would therefore be allowed. (Coddington Decl., Ex. O.)

11. The Certificate issued on July 14, 2009. (Coddington Decl., Ex. K.)

12. Claim 1 of the '481 Patent now provides:

A compact portable apparatus for dispensing a liquid under pressure at a substantially constant flow rate over a period of time comprising:

an elongated generally cylindrical support member;

elongated elastic sleeve means mounted and sealingly secured at fixed spaced longitudinal positions on said support member for defining a substantially zero non-pressurized volume pressure reservoir for holding a liquid in a pressurized state for dispensing therefrom;

housing means comprising collapsible non-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 25
Page 198

Not Reported in F.Supp.2d, 2010 WL 144405 (S.D.Cal.)
(Cite as: 2010 WL 144405 (S.D.Cal.))

stretchable housing means for containing said support member and said pressure reservoir for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member, *said collapsible non-stretchable housing means loosely positioned around said sleeve means and defining a chamber between said sleeve means and said collapsible non-stretchable housing means;*

inlet means for introducing a liquid into said elastic pressure reservoir; and outlet means for dispensing liquid from said pressure reservoir to a selected site.

*(Id.* at 4.)

13. Claim 15 of the '481 Patent now recites:

A compact collapsible infusion apparatus for dispensing a liquid under pressure at a predetermined substantially constant flow rate over a period of time comprising:

an elongated generally cylindrical support member having inlet means including an inlet port in one end of said member, and outlet means including an outlet port in the other end of said member;

elongated elastic sleeve means mounted in nonstretched surface contact and sealingly secured at fixed space longitudinal positions on said support member for defining a substantially zero nonpressurized volume pressure reservoir for holding a liquid in a pressurized state for dispensing therefrom;

*3 first housing means including a collapsible shell enclosing said support member and said pressure reservoir, said housing *means* having a size and shape for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member, *said collapsible shell loosely positioned around said sleeve means and defining a chamber between said sleeve means and said col-*

lapsible shell;

inlet means in one end of said support member for introducing a liquid into said elastic pressure reservoir; and

outlet means in the other end of said support member for dispensing liquid from said pressure reservoir to a selected site.

*(Id.)*

## II.

### CONCLUSIONS OF LAW

1. As an initial matter, the Court finds Defendants are not entitled to equitable intervening rights in light of the jury's finding of willful patent infringement. *See Shockley v. Arcan, Inc.,* 248 F.3d 1349, 1361 (Fed.Cir.2001) (stating finding of willful infringement amply supported district court's decision to deny equitable intervening rights).

2. The doctrine of absolute intervening rights is based on the second paragraph of 35 U.S.C. § 252, FN2 and provides accused infringers with an affirmative defense that limits infringement damages to "the period following the issuance of the reexamination certificate." *Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1346 (Fed.Cir.1998). *See also Bic Leisure Products, Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1221 (Fed.Cir.1993) (stating absolute intervening rights defense addresses damages issue).

> FN2. The second paragraph of section 252 provides: "A reissued patent shall not abridge or affect the right of any person or that persons's successors in business who, prior to grants of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 25
Page 199

Not Reported in F.Supp.2d, 2010 WL 144405 (S.D.Cal.)
(Cite as: 2010 WL 144405 (S.D.Cal.))

sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thin infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practices of any process patented buy the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue." 35 U.S.C. § 252, ¶ 2.

3. Before a defendant can raise the defense, the court must determine whether the claims in the original patent are "substantially identical" to those in the reexamined patent. *See* 35 U.S.C. § 252, ¶ 1; *Westvaco Corp. v. Int'l Paper Co.,* 991 F.2d 735, 742 (Fed.Cir.1993) (citing *Kaufman Co., Inc. v. Lantech, Inc.,* 807 F.2d 970, 977 (Fed.Cir.1986)).

4. The Federal Circuit has held that "identical" under section 252 "does not mean verbatim, but rather means 'without substantive change.' " *Tennant Co. v. Hako Minuteman, Inc.,* 878 F.2d 1413, 1417 (Fed.Cir.1989) (quoting *Slimfold Manufacturing Co., Inc. v. Kinkead Industries, Inc.,* 810 F.2d 1113, 1115 (Fed.Cir.1987)).

5. Furthermore, "courts have held that it is the scope of the claim that must be identical, not that the identical words must be used." *Slimfold,* 810 F.2d at 1115.

6. Here, Defendants assert Plaintiff narrowed the scope of the claims of the ' 481 Patent during reexamination when it amended the claims to state that the collapsible non-stretchable housing means be "loosely positioned around said sleeve means" and that it "defin[e] a chamber between said sleeve means and said collapsible non-stretchable housing means[.]" Plaintiff argues the amendments merely clarify limitations that were inherent in the original claims.

7. In determining " 'whether a claim change is substantive it is necessary to analyze the claims of the original and the reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information.' " *Laitram,* 163 F.3d at 1347 (quoting *Laitram Corp. v. NEC Corp.,* 952 F.2d 1357, 1362-63 (Fed.Cir.1991) ( *"Laitram I"* )).

*4 8. This Court has examined those facts, and concludes that the original claims were substantively changed during the reexamination. Contrary to Plaintiff's suggestion, there is nothing in the specification of the '481 Patent that inherently or implicitly limits the housing means as "loosely positioned around said sleeve means" or "defining a chamber between said sleeve means and said collapsible non-stretchable housing means." Although the drawings depict a housing means that is loosely positioned around the sleeve means and that defines a chamber between the sleeve means and the housing means, those drawings do not operate as limitations on the scope of the claim. Indeed, Plaintiff fails to cite any portion of the specification of the ' 481 Patent that requires those limitations be read into the original claims.

9. Instead, Plaintiff argues the amendments to the claims "highlighted that the housing is a separate structure from the bladder assembly, *i.e.,* sleeve means." (Opp'n to Mot. at 4.) However, that is not what the amendments do. Rather, the amendments explain how the housing means is positioned in relation to the sleeve means. It is clear that the Examiner understood that the housing means was a sep-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 25
Page 200

Not Reported in F.Supp.2d, 2010 WL 144405 (S.D.Cal.)
**(Cite as: 2010 WL 144405 (S.D.Cal.))**

arate structure from the sleeve means when she rejected the original claims of the '481 Patent. (*See* Coddington Decl., Ex. L at 3.) That was not the reason the original claims were rejected. Rather, the examiner rejected the claims because Block Medical anticipated each element of the claims, including the housing means and the separate sleeve means. Therefore, the amendment did not simply highlight that the structures were separate: It explained the positional relationship between the two structures.

10. Plaintiff also argues the amendments were required by the "enabling" and "confining" limitations in the original claims. (*See* Opp'n to Mot. at 6.) In essence, Plaintiff asserts the housing means had to be loosely positioned around the sleeve means for the pump to operate properly. However, it appears the pump could operate properly if the housing means was in a fixed position around the sleeve means, as in Block Medical. Although having the housing means loosely positioned around the sleeve means may have provided some slight improvement in the performance of the pump, the primary objective of this type of housing means was to decrease the cost of "packaging, storage and shipment." (Zelkind Decl., Ex. 17 at 160 ('481 Patent, col. 1, lines 47-48).) It was not meant to improve the performance of the pump. The Court therefore rejects Plaintiff's argument that the amendments were required by the "enabling" and "confining" limitations of the original claims.

11. In light of the Court's conclusion that the claims in the reexamined patent are not substantially identical to the claims in the original patent, Plaintiff's damages must be limited to those suffered after the Certificate issued on July 14, 2009. Defendants assert there is no evidence of Plaintiff's damages after that specific date, but there is evidence of the number of pumps Defendants sold after July 31, 2009. (*See* Coddington Decl., Ex. Q at 13.) Of the total number of pumps sold, 17,219, only 3,967 were sold after July 31, 2009. (*Id.*) This amounts to twenty-three percent of the total pumps sold. Applying this percentage to the damage awards in this case, the Court reduces the compensatory patent damages award against Apex, which was $2,876,548, to $661,606. The Court similarly reduces the compensatory patent damages award against Zone, which was $93,385, to $21,479.

### III.

### CONCLUSION AND ORDER

**\*5** Based on the foregoing findings of fact and conclusions of law, Defendants' motion to recognize intervening rights is granted, and the compensatory damage award for patent infringement against Apex is reduced from $2,876,548 to $661,606, and the compensatory damage award for patent infringement against Zone is reduced from $93,385 to $21,479.

**IT IS SO ORDERED.**

S.D.Cal.,2010.
I-Flow Corp. v. Apex Medical Technologies, Inc.
Not Reported in F.Supp.2d, 2010 WL 144405 (S.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 25
Page 201

Westlaw.

217 F.3d 853, 1999 WL 819683 (C.A.Fed.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 217 F.3d 853, 1999 WL 819683 (C.A.Fed.))**

**H**

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTAF Rule 47.6 for
rules regarding the citation of unpublished opin-
ions.)

United States Court of Appeals, Federal Circuit.
Harold G. ABBEY, Plaintiff-Appellant,
v.
ROBERT BOSCH GMBH, Mercedes-Benz of
North America, Inc., L.P. Evans Motors of West
Palm Beach, Inc., Bill Ussery Motors, Inc., and
Mercedes-Benz A.G., Defendants-Appellees.
**No. 99-1169.**

Oct. 6, 1999.
Rehearing Denied; Suggestion for Rehearing En
Banc Declined Nov. 16, 1999.

Before PLAGER, SCHALL, and GAJARSA, Cir-
cuit Judges.

PLAGER, Circuit Judge.

*1 Harold G. Abbey appeals two summary judg-
ment decisions of the United States District Court
for the Southern District of Florida. *See Abbey v.
Bill Ussery Motors, Inc.,* No. 93-6231 (S.D.Fla.
Feb. 28, 1999). We *affirm* the district court's grant
of summary judgment of noninfringement, and also
*affirm* the district court's grant of summary judg-
ment that the original and reexamined claims of
Abbey's patent are not identical.

BACKGROUND

Abbey brought suit against Mercedes-Benz A.G.,
Mercedes-Benz of North America, Inc., Bill Ussery
Motors, Inc., and L.P. Evans Motors of West Palm

Beach, Inc., (collectively "Defendants") alleging
that fuel-injection systems used in certain Mercedes
automobiles infringed Abbey's U.S. Patent No.
4,387,685 ("the original '685 patent"). Robert
Bosch, GmbH intervened as a defendant and re-
quested that the United States Patent and Trade-
mark Office ("PTO") reexamine the original '685
patent. During reexamination, the PTO examiner fi-
nally rejected several claims, including independent
claim 1, as unpatentable in light of several prior art
references not cited during the original prosecution.
After unsuccessful appeals, Abbey obtained allow-
ance of his claims by amending them to include sig-
nificant limitations.

After Abbey received his reexamination certificate,
the district court reinstated the infringement action,
which it had dismissed in view of the examiner's fi-
nal rejection during reexamination. Defendants
moved for summary judgment of noninfringement
and partial summary judgment that Abbey could
enforce the claims of the reexamined '685 patent
only from the date of the reexamination certificate
because the reexamined claims were not identical to
those of the original '685 patent. After the district
court held a *Markman* hearing to construe the
claims of the reexamined '685 patent, it granted
both of Defendants' summary judgment motions.

DISCUSSION

Summary judgment is proper when there are no
genuine issues of material fact and the moving
party is entitled to judgment as a matter of law. *See*
Fed.R.Civ.P. 56(c). In deciding whether a genuine
issue of material fact exists, the evidence must be
viewed in the light most favorable to the nonmov-
ing party. *See Anderson v. Liberty Lobby, Inc.,* 477
U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). We review the district court's grant of sum-
mary judgment without deference. *See Conroy v.
Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d
1373, 1377 (Fed.Cir.1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 26
Page 202

217 F.3d 853, 1999 WL 819683 (C.A.Fed.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 217 F.3d 853, 1999 WL 819683 (C.A.Fed.))**

### A. Summary Judgment of Noninfringement

The first step of an infringement analysis is claim construction, which we review independently. *See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1451, 1456, 46 USPQ2d 1169, 1171, 1174 (Fed.Cir.1998) (en banc). The only claim construction issue is whether the fluidic system of claim 1, the only independent claim of the reexamined '685 patent, requires a spool having an "interior passage." The pertinent claim limitation reads:

*2 a cylindrical spool supported within the tubular section of casing for free axial movement therein, said spool having *an interior ... flow passage* extending to a downstream end of said spool, said spool defining *an exterior ... flow passage* in the annular space between the exterior surface of the spool and the tubular section of casing ... whereby the fluid stream admitted into the tubular section of casing is directed and *flows through the interior and exterior passages,* said spool having *at least said exterior ... flow passage,* causing said fluid stream to exert a ... force on the spool ...;

(emphasis added).

In determining the scope of a claim, we look first to the plain language of the claim itself. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996). We agree with the district court that the claim language unambiguously recites a spool containing an interior passage and defining an exterior passage. The language reciting that the fluid stream "flows through the interior and exterior passages" is further evidence that the claim requires an interior passage in the spool.

The original prosecution history confirms that the spool requires an interior and an exterior passage. Although Abbey's originally filed claims did not require an interior passage, he canceled his original claims in response to the examiner's prior art rejection and submitted a new claim, which issued as claim 1, reciting a spool with an interior passage and defining an exterior passage. Therefore, according to both the plain language of the claim and the prosecution history, the claim requires a spool having an interior passage.

Abbey argues that the claim language "said spool having at least said exterior ... flow passage" indicates that only an exterior passage is required, and that a "solid plug" device with no interior passage falls within the scope of the claim. This cited language is not inconsistent with the requirement that the spool have both an interior and an exterior passage as required by the other claim language cited above, which Abbey ignores.

The second step of an infringement analysis requires the patentee to prove that the accused device embodies every limitation of the claim, either literally or by a substantial equivalent. *See Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1578, 27 USPQ2d 1836, 1840 (Fed.Cir.1993). Abbey has set forth no argument, in either his response to Defendants' motion for summary judgment or his appeal brief filed with this court, that Defendants' devices infringe the claims of the '685 patent either literally or under the doctrine of equivalents.[FN1] Indeed, Abbey has repeatedly conceded that the accused devices do not contain an interior passage, and therefore the district court did not err in granting summary judgment of noninfringement with respect to literal infringement of claim 1 and dependent claims 2-15.

> FN1. The district court did not distinguish between literal infringement and infringement under the doctrine of equivalents. In his opposition to Defendants' motion for summary judgment, Abbey did not address either type of infringement; he merely reargued the claim construction issue. We address both types of infringement for clarity.

*3 Summary judgment of noninfringement under the doctrine of equivalents is proper if no reason-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 26
Page 203

217 F.3d 853, 1999 WL 819683 (C.A.Fed.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 217 F.3d 853, 1999 WL 819683 (C.A.Fed.))**

able jury could determine that a claim limitation is met in the accused device by an equivalent. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1875 n. 8 (1997). The scope of the doctrine of equivalents is limited here by prosecution history estoppel, which prevents the patentee from expanding the scope of his claims to subject matter surrendered during prosecution to overcome a prior art rejection. *See Litton Sys., Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1462, 46 US-PQ2d 1321, 1330 (Fed.Cir.1998). When he amended claim 1 to include a spool with an inside passage, Abbey surrendered coverage of the Defendants' solid plug devices. Therefore, the district court did not err in granting summary judgment of noninfringement with respect to infringement under the doctrine of equivalents.

### B. Summary Judgment Regarding Reexamined Claims

If a patentee makes substantive changes during reexamination so that the claims are no longer "identical" in scope to any of the original claims, the patentee may seek infringement damages only for the period following the issuance of the reexamination certificate. *See* 35 U.S.C. §§ 252, 307(b) (1994); *Laitram Corp. v. NEC Corp. .,* 163 F.3d 1342, 1346, 49 USPQ2d 1199, 1202 (Fed.Cir.1998) . This court reviews without deference the district court's conclusion that the original and reexamined claims are not identical in scope. *See id.* at 1346-47, 163 F.3d 1342, 49 USPQ2d at 1202.

During reexamination, the examiner rejected claim 1 of the original '685 patent as anticipated by prior art patents to De Rugeris and Holzbaur. After unsuccessful appeals to the Board of Patent Appeals and Interferences and this court, Abbey substantially amended claim 1. A plain reading of reexamined claim 1 shows that Abbey made substantive changes to the scope of claim 1. *See id .* at 1347-48, 163 F.3d 1342, 49 USPQ2d at 1203 (noting that a plain reading of the claims can reveal change in

scope). For example, Abbey added limitations to the interior flow passage of the spool so that the claim covers only a particular type of interior passage, i.e., an "interior *central parabolic venturi flow passage extending to a downstream end of said spool"* (emphasis added). Furthermore, it is significant that Abbey amended the claim in response to a prior art rejection. *See id.* at 1348, 163 F.3d 1342, 49 USPQ2d at 1203 (stating that claim amendment in response to prior art rejection is not a substantive change per se but is a significant piece of prosecution history that must be considered). Because the scope of claim 1 is substantively changed from its original scope, dependent claims 2-15 are also substantively changed. Therefore, the district court did not err in granting summary judgment that the original and reexamined claims of Abbey's patent are not identical and that Abbey can enforce the claims of his patent only from the date of the reexamination certificate.

C.A.Fed.,1999.
Abbey v. Robert Bosch GMBH
217 F.3d 853, 1999 WL 819683 (C.A.Fed.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 26
Page 204

## 35 U.S.C. 307 Certificate of patentability, unpatentability, and claim cancellation.

(a)    In a reexamination proceeding under this chapter, when the time for appeal has expired or any appeal proceeding has terminated, the Director will issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent any proposed amended or new claim determined to be patentable.

(b)    Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding will have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.

(Added Dec. 12, 1980, Public Law 96-517, sec. 1, 94 Stat. 3016; amended Dec. 8, 1994, Public Law 103-465, sec. 533(b)(8), 108 Stat. 4990; Nov. 29, 1999, Public Law 106-113, sec. 1000(a)(9), 113 Stat. 1501A-582 (S. 1948 sec. 4732(a)(10)(A)).)

EXHIBIT 27
Page 205

## 35 U.S.C. 252 Effect of reissue.

The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are substantially identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are substantially identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

(Amended Dec. 8, 1994, Public Law 103-465, sec.533(b)(2), 108 Stat. 4989; Nov. 29, 1999, Public Law 106-113, sec. 1000(a)(9), 113 Stat. 1501A-566 (S. 1948 sec.4507(8)).)

EXHIBIT 28
Page 206

Case 8:10-cv-01198-CJC -RNB   Document 32-5   Filed 12/13/10   Page 58 of 68   Page ID #:410

### [1]—Continuation—The Valid Claim Provision

**[a]—Two Expressions of Continuation.** The present statute on the effect of a reissue, 35 U.S.C. Section 252, contains two expressions of the concept that a reissue patent continues, to a limited extent, the rights conferred by an original patent.

The first expression is in the first paragraph of Section 252. Prior to 1928, the grant of a reissue patent abated all causes of action and all suits based on the original patent.[1] The Act of 1928, codified in the first paragraph of Section 252, altered the abatement rule by providing for continuation where the claims of the original patent are carried forth into the reissue patent—but only "to the extent that [the reissued patent's] claims are identical with the original patent."[2]

---

"This potential risk is balanced to a certain extent by the ability of the court, in interpreting the claim, to take into consideration the motivation for adding or altering the specification in a reissue applied for during the litigation. Nevertheless, it is far from clear that new information added to a patent by way of a reissue during litigation should be given any substantial weight where that information was added for the admitted purpose of 'clarifying' the very term which is at the center of the dispute between the parties.

"Notwithstanding this concern, the Federal Circuit has been clear on the point, and, accordingly, the . . . Reissue will be considered in full in interpreting the [disputed claim] term 'parallel edges.' In doing so, however, it must be remembered that the first consideration in interpreting a claim is the language of a claim itself. Neither the specification, &hellip nor the prosecution history, Markman v. Westview Instr., Inc., 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996), can be used to 'enlarge, diminish or vary the limitation in the claims.' *Id.* This applies with at least equal force to specification language that is altered or added in a reissued patent." 144 F. Supp.2d at 172-73, n.3

§ 15.05[1]

[1] See § 15.02[7].

E.g., Shull Perforating Co. v. Cavins, 94 F.2d 357, 369, 36 USPQ 217 (9th Cir. 1938).

[2] 35 U.S.C. § 252.

See Laitram Corp. v. NEC Corp., 952 F.2d 1357, 1360-61, 21 USPQ2d 1276, 1278-79 (Fed. Cir. 1991) ("Recovery of damages for an asserted infringement during the period between the date of issuance of the original patent and the date of issuance of the reexamined patent requires that the original and reexamined claims be 'identical' . . . . 'Identical' does not mean verbatim."); Kaufman Company, Inc. v. Lantech, Inc., 807 F.2d 970, 976, 1 USPQ2d 1202, 1206-07 (Fed. Cir. 1986) ("The first paragraph makes clear that if the claims in the original and reissued patents are 'identical,' the reissued patent is deemed to have effect from the date of the original patent. If not, then the patentee has *no* rights to enforce before the date of reissue because the original patent was surrendered and is dead. . . . This is *not*, however, so-called 'intervening rights' set out in the second paragraph of § 252 . . . ."); Howes v. Medical Components, Inc., 814 F.2d 638, 645, 2 USPQ2d 1271, 1275 (Fed. Cir. 1987), *on remand*, 7 USPQ2d 1511 (E.D. Pa. 1988) ("Under the provisions of the reissue statute, 35 USC 252, surrender of the original patent upon reissue does not affect any pending action or abate any cause of action to the extent that the claims of the original and reissue patents are identical . . . Congress intended this section to ameliorate the harsh effect of a patent's surrender, which, prior to the adoption of the rule now incorporated in § 252, required dismissal, for failure to state a cause of action, of any action filed before the patent

(Rel.95-10/04  Pub.525)

EXHIBIT 29
Page 207

The second expression of the continuation concept is in the "specific thing" intervening right provision of the second paragraph of Section 252. It recognizes the continuation concept by making an exception for things that infringe "a valid claim of the reissue patent which was in the original patent."[3] This second expression of continuation does not use the word "identical," but it is implicitly treated as containing the same standard of identity as the first expression.[4]

was surrendered. . . . But whether the suit is denominated as for infringement of the original claim or of the identical reissue claim, it is still necessary to look at the prosecution history of the reissue in order to construe the disputed claim."); Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc., 731 F.2d 818, 827, 221 USPQ 568, 574-575 (Fed. Cir. 1984), *appeal after remand,* 756 F.2d 1574 (Fed. Cir. 1985) ("Congress, in this statute, has explicitly limited claim continuity to claims in the reissued patent *identical* to claims in the original patent. The statute does not allow the claims of the original patent some other form of survival. The original claims are dead. The statute permits, however, the claims of the reissue patent to reach back to the date the original patent issued, *but only if* those claims are identical with claims in the original patent. With respect to new or amended claims, an infringer's liability commences only from the date the reissue patent is issued."); Rohm & Haas Co. v. Mobil Oil Corp., 654 F. Supp. 82, 3 USPQ2d 1619 (D. Del. 1987) (discovery motion; obtaining an opinion of counsel may be pertinent to an issue of intervening rights under the second paragraph of Section 252, but the accused infringer does not need such an opinion in order to assert the statutory provision of the first paragraph of Section 252 precluding liability for acts prior to the reissuance of the patent when no claim in the reissue patent is identical to the original patent); R.E. Phelon Company Inc. v. Wabash Inc., 640 F. Supp. 1383, 1 USPQ2d 1680 (N.D. Ind. 1986), *aff'd in part & vacated in part,* 824 F.2d 1977 (Fed. Cir. 1987).

Cf. Teradyne, Inc. v. Hewlett-Packard Co., 1994 WL 327213 (N.D. Calif. 1994) (delay period for laches begins as to claims in original patent with patentee's knowledge of infringement even though the patent was subsequently reissued); Hewlett-Packard Co. v. Bausch & Lomb Inc., 692 F. Supp. 1118, 8 USPQ2d 1179, 1191 (N.D. Calif. 1988), *aff'd in part, vacated in part, & remanded,* 882 F.2d 1556, 11 USPQ2d 1750 (Fed. Cir. 1989), *cert. denied,* 493 U.S. 1076 (1990), discussed § 15.05[5] (the claims carried over from an original patent to a reissue patent may survive even though the reissue patent itself is invalid for failure to comply with the requirement for reissue that the original patent be defective because of "error").

See generally Killworth, "The Federal Circuit Treatment of Non-Art Rejections/Defenses and Reissue/Reexamination: The First Three Years," 13 AIPLA Q.J. 220, 237 (1985).

[3] See, e.g., Schnell v. Allbright-Nell Co., 348 F.2d 444, 146 USPQ 322 (7th Cir. 1965), *cert. denied,* 383 U.S. 934, *reh'g denied,* 384 U.S. 914 (1966) ("Nor do we find any intervening rights in the defendants who have infringed valid claims of the original patent which were retained unchanged in the patent reissue."); Weller Mfg. Co. v. Wen Prods., Inc., 231 F.2d 795, 109 USPQ 73 (7th Cir. 1956); Valmont Industries Inc. v. Reinke Manufacturing Co. Inc., 14 USPQ2d 1374, 1383 (D. Neb. 1990); Mobile Auto Crushers Corp. of America v. Fjarli, 197 USPQ 620 (D. Ore. 1978); De Long v. Lemco Hosiery Mills, Inc., 223 F. Supp. 1001, 139 USPQ 201 (M.D. N.C. 1963) ("the invalidity of a new claim does not impair the validity of an original claim which is repeated and separately stated in the reissue patent"); *In re* Certain Apparatus for Flow Injection Analysis & Components Thereof, 226 USPQ 236, 238 n.4 (U.S.I.T.C. 1984) (citing Treatise).

[4] See Kaufman Company, Inc. v. Lantech, 807 F.2d 970, 1 USPQ2d 1202 (Fed. Cir. 1986), discussed below; *In re* Certain Apparatus for Flow Injection Analysis & Components Thereof, 226 USPQ 236, 238 n.4 (U.S. Int'l Trade Comm'n 1984) ("The term 'identical' occurs only in the first paragraph of 35 U.S.C. § 252 . . . However, the second paragraph of 35 U.S.C. § 252 refers to 'a valid claim of the reissued [reexamined] patent which was in the original patent,' a phrase which has been treated similarly.").

(Rel.95–10/04  Pub.525)

EXHIBIT 29
Page 208

## [1]—Continuation—The Valid Claim Provision

**[a]—Two Expressions of Continuation.** The present statute on the effect of a reissue, 35 U.S.C. Section 252, contains two expressions of the concept that a reissue patent continues, to a limited extent, the rights conferred by an original patent.

The first expression is in the first paragraph of Section 252. Prior to 1928, the grant of a reissue patent abated all causes of action and all suits based on the original patent.[1] The Act of 1928, codified in the first paragraph of Section 252, altered the abatement rule by providing for continuation where the claims of the original patent are carried forth into the reissue patent—but only "to the extent that [the reissued patent's] claims are identical with the original patent."[2]

---

"This potential risk is balanced to a certain extent by the ability of the court, in interpreting the claim, to take into consideration the motivation for adding or altering the specification in a reissue applied for during the litigation. Nevertheless, it is far from clear that new information added to a patent by way of a reissue during litigation should be given any substantial weight where that information was added for the admitted purpose of 'clarifying' the very term which is at the center of the dispute between the parties.

"Notwithstanding this concern, the Federal Circuit has been clear on the point, and, accordingly, the . . . Reissue will be considered in full in interpreting the [disputed claim] term 'parallel edges.' In doing so, however, it must be remembered that the first consideration in interpreting a claim is the language of a claim itself. Neither the specification, &hellip nor the prosecution history, Markman v. Westview Instr., Inc., 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996), can be used to 'enlarge, diminish or vary the limitation in the claims.' *Id.* This applies with at least equal force to specification language that is altered or added in a reissued patent." 144 F. Supp.2d at 172-73, n.3

§ 15.05[1]

[1] See § 15.02[7].

E.g., Shull Perforating Co. v. Cavins, 94 F.2d 357, 369, 36 USPQ 217 (9th Cir. 1938).

[2] 35 U.S.C. § 252.

See Laitram Corp. v. NEC Corp., 952 F.2d 1357, 1360-61, 21 USPQ2d 1276, 1278-79 (Fed. Cir. 1991) ("Recovery of damages for an asserted infringement during the period between the date of issuance of the original patent and the date of issuance of the reexamined patent requires that the original and reexamined claims be 'identical' . . . . 'Identical' does not mean verbatim."); Kaufman Company, Inc. v. Lantech, Inc., 807 F.2d 970, 976, 1 USPQ2d 1202, 1206-07 (Fed. Cir. 1986) ("The first paragraph makes clear that if the claims in the original and reissued patents are 'identical,' the reissued patent is deemed to have effect from the date of the original patent. If not, then the patentee has *no* rights to enforce before the date of reissue because the original patent was surrendered and is dead. . . . This is *not*, however, so-called 'intervening rights' set out in the second paragraph of § 252 . . ."); Howes v. Medical Components, Inc., 814 F.2d 638, 645, 2 USPQ2d 1271, 1275 (Fed. Cir. 1987), *on remand*, 7 USPQ2d 1511 (E.D. Pa. 1988) ("Under the provisions of the reissue statute, 35 USC 252, surrender of the original patent upon reissue does not affect any pending action or abate any cause of action to the extent that the claims of the original and reissue patents are identical . . . Congress intended this section to ameliorate the harsh effect of a patent's surrender, which, prior to the adoption of the rule now incorporated in § 252, required dismissal, for failure to state a cause of action, of any action filed before the patent

(Rel.95–10/04 Pub.525)

EXHIBIT 29
Page 207

The second expression of the continuation concept is in the "specific thing" intervening right provision of the second paragraph of Section 252. It recognizes the continuation concept by making an exception for things that infringe "a valid claim of the reissue patent which was in the original patent."[3] This second expression of continuation does not use the word "identical," but it is implicitly treated as containing the same standard of identity as the first expression.[4]

---

was surrendered. . . . But whether the suit is denominated as for infringement of the original claim or of the identical reissue claim, it is still necessary to look at the prosecution history of the reissue in order to construe the disputed claim."); Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc., 731 F.2d 818, 827, 221 USPQ 568, 574-575 (Fed. Cir. 1984), *appeal after remand,* 756 F.2d 1574 (Fed. Cir. 1985) ("Congress, in this statute, has explicitly limited claim continuity to claims in the reissued patent *identical* to claims in the original patent. The statute does not allow the claims of the original patent some other form of survival. The original claims are dead. The statute permits, however, the claims of the reissue patent to reach back to the date the original patent issued, *but only if* those claims are identical with claims in the original patent. With respect to new or amended claims, an infringer's liability commences only from the date the reissue patent is issued.");); Rohm & Haas Co. v. Mobil Oil Corp., 654 F. Supp. 82, 3 USPQ2d 1619 (D. Del. 1987) (discovery motion; obtaining an opinion of counsel may be pertinent to an issue of intervening rights under the second paragraph of Section 252, but the accused infringer does not need such an opinion in order to assert the statutory provision of the first paragraph of Section 252 precluding liability for acts prior to the reissuance of the patent when no claim in the reissue patent is identical to the original patent); R.E. Phelon Company Inc. v. Wabash Inc., 640 F. Supp. 1383, 1 USPQ2d 1680 (N.D. Ind. 1986), *aff'd in part & vacated in part,* 824 F.2d 1977 (Fed. Cir. 1987).

Cf. Teradyne, Inc. v. Hewlett-Packard Co., 1994 WL 327213 (N.D. Calif. 1994) (delay period for laches begins as to claims in original patent with patentee's knowledge of infringement even though the patent was subsequently reissued); Hewlett-Packard Co. v. Bausch & Lomb Inc., 692 F. Supp. 1118, 8 USPQ2d 1179, 1191 (N.D. Calif. 1988), *aff'd in part, vacated in part, & remanded,* 882 F.2d 1556, 11 USPQ2d 1750 (Fed. Cir. 1989), *cert. denied,* 493 U.S. 1076 (1990), discussed § 15.05[5] (the claims carried over from an original patent to a reissue patent may survive even though the reissue patent itself is invalid for failure to comply with the requirement for reissue that the original patent be defective because of "error").

See generally Killworth, "The Federal Circuit Treatment of Non-Art Rejections/Defenses and Reissue/Reexamination: The First Three Years," 13 AIPLA Q.J. 220, 237 (1985).

[3] See, e.g., Schnell v. Allbright-Nell Co., 348 F.2d 444, 146 USPQ 322 (7th Cir. 1965), *cert. denied,* 383 U.S. 934, *reh'g denied,* 384 U.S. 914 (1966) ("Nor do we find any intervening rights in the defendants who have infringed valid claims of the original patent which were retained unchanged in the patent reissue."); Weller Mfg. Co. v. Wen Prods., Inc., 231 F.2d 795, 109 USPQ 73 (7th Cir. 1956); Valmont Industries Inc. v. Reinke Manufacturing Co. Inc., 14 USPQ2d 1374, 1383 (D. Neb. 1990); Mobile Auto Crushers Corp. of America v. Fjarli, 197 USPQ 620 (D. Ore. 1978); De Long v. Lemco Hosiery Mills, Inc., 223 F. Supp. 1001, 139 USPQ 201 (M.D. N.C. 1963) ("the invalidity of a new claim does not impair the validity of an original claim which is repeated and separately stated in the reissue patent"); *In re* Certain Apparatus for Flow Injection Analysis & Components Thereof, 226 USPQ 236, 238 n.4 (U.S.I.T.C. 1984) (citing Treatise).

[4] See Kaufman Company, Inc. v. Lantech, Inc., 807 F.2d 970, 1 USPQ2d 1202 (Fed. Cir. 1986), discussed below; *In re* Certain Apparatus for Flow Injection Analysis & Components Thereof, 226 USPQ 236, 238 n.4 (U.S. Int'l Trade Comm'n 1984) ("The term 'identical' occurs only in the first paragraph of 35 U.S.C. § 252 . . . However, the second paragraph of 35 U.S.C. § 252 refers to 'a valid claim of the reissued [reexamined] patent which was in the original patent,' a phrase which has been treated similarly.").

(Rel.95–10/04 Pub.525)

EXHIBIT 29
Page 208

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)
(Cite as: 2008 WL 4414763 (W.D.Wash.))

**H**

Only the Westlaw citation is currently available.

United States District Court, W.D. Washington,
at Tacoma.
ATLANTIC CONSTRUCTION FABRICS, INC.,
et al., Plaintiffs,
v.
METROCHEM, INC., et al., Defendants.
**No. C03-5645BHS.**

Sept. 24, 2008.

West KeySummary
**Patents 291 ☞141(7)**

291 Patents
   291VII Reissues
      291k141 Identity of Invention
         291k141(7) k. Narrowing Claims. Most
Cited Cases
Patentee substantively altered the scope of patent
claim, and therefore alleged infringer's motion for
summary judgment on non-infringement before the
date of the reexamination certificate was granted.
When patentee amended claim to include the limit-
ation preforming the filter bag by joining sidewall
portions together, they made a substantive change
to the scope of the claim. The amendment was not a
clarifying amendment; it was a scope limiting
amendment that added a limitation to the filter bag
element of the claim. 35 U.S.C.A. § 307; 35
U.S.C.A. § 252.

Horace Van Smith, Matthew R. Osenga, Patrick R.
Hanes, Williams, Mullen, Richmond, VA, John C.
Guadnola, Dianne K. Conway, Gordon, Thomas,
Honeywell, Malanca, Peterson & Daheim, Tacoma,
WA, for Plaintiffs.

Matthew C. Phillips, Steven T. Lovett, Stoel, Rives,
Susan S. Ford, Sussman, Shank, Wapnick, Caplan
& Stiles, Portland, OR, Kenneth M. Odza, Vanessa
Soriano Power, Stoel, Rives, Seattle, WA, for De-
fendants.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUM-
MARY JUDGMENT

BENJAMIN H. SETTLE, District Judge.

**\*1** This matter comes before the Court on Defend-
ants' Motion for Summary Judgment (Dkt.87). The
Court has considered the pleadings filed in support
of and in opposition to the motion and the re-
mainder of the file and hereby grants in part and
denies in part the motion for the reasons stated
herein.

**I. PROCEDURAL BACKGROUND**

Plaintiffs initiated this action in the United States
District Court for the Western District of Virginia,
Harrisonburg Division, for patent infringement and
breach of a prior settlement agreement. Dkt. 84. On
November 17, 2003, the action was transferred to
this district and subsequently assigned to the Hon-
orable Franklin D. Burgess. Dkt. 26. On August 1,
2007, the action was reassigned to the undersigned.
Dkt. 82.

On December 18, 2003, Plaintiffs Atlantic Con-
struction Fabrics, Inc. and George E. Logue, Jr.
filed an Amended Complaint alleging patent in-
fringement and breach of contract against Defend-
ants MetroChem, Inc., Spider Environmental, Inc.,
Roni R. Sasaki, and Derek A. Sasaki. Dkt. 38
("Amended Complaint").

On September 16, 2004, Judge Burgess held a
claim interpretation hearing and, on September 21,
2004, issued an order construing disputed terms in
claims 10 and 11 of Plaintiff's U.S. Patent No.
5,575,925 (the " '925 Patent"). Dkt. 60. On April
14, 2005, the Court issued an Order For Stay of
Proceedings Pending Resolution of Reexamination
of the '925 Patent in the U.S. Patent and Trademark
Office. Dkt. 64.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 30
Page 209

Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)
**(Cite as: 2008 WL 4414763 (W.D.Wash.))**

On July 17, 2008, Plaintiff Atlantic Construction moved the Court to lift the stay and enter an amended scheduling order because Plaintiffs claimed that the U.S. Patent and Trademark Office would soon issue a reexamination certificate for the '925 Patent. Dkt. 84. On August 14, 2008, the Court granted Plaintiff's motion and lifted the stay. On August 26, 2008, the patent office issued the reexamination certificate. *See* Dkt. 101 at 14-15 ("Reexamination Certificate").

On July 28, 2008, Defendants filed a Motion for Summary Judgment. Dkt. 87. On August 25, 2008, Plaintiffs responded. Dkt. 99. On August 29, 2008, Defendants replied. Dkt. 101.

### II. FACTUAL BACKGROUND

In 1999, Plaintiffs filed an action against Defendant MetroChem alleging that Defendant's product, the Drain Diaper, infringed Plaintiffs' '925 Patent. Amended Complaint, ¶ 11. The parties ended that proceeding by entering into a settlement agreement. Dkt. 89, Declaration of Matthew C. Phillips ("Phillips Decl."), Exh. G. The agreement provides, in relevant part, as follows:

[MetroChem] will not hereafter for the life of the ['925 Patent], manufacture, use, or sell any product covered by one or more of the valid claims of the Patent. "Valid Claims," as used herein, means all claims of the Patent except those which have been held, in a final order from which no appeal is available or timely taken, (a) by the United States Patent & Trademark Office to be unpatentable or (b) by a court of competent jurisdiction to be invalid or unenforceable.

*2 *Id.* ¶ 3(A).

In the present action, Plaintiffs allege that Defendants' product, the Drain Web, infringes claims 10 and 11 of Plaintiffs' '925 Patent. Amended Complaint, ¶¶ 21-22. Plaintiffs claim that Defendants sought reexamination of the '925 patent based on prior art. *See* Dkt. 99 at 3. The patent office granted

an ex parte reexamination. *See* Phillips Decl., Exh. A.

On October 2, 2007, the patent examiner issued an office action that rejected claims 10 and 11 of the ' 925 patent. *Id.* at 3-11. These claims were rejected under 35 U.S.C. § 102 in light of prior art that anticipated Plaintiffs' claimed subject matter. *Id* . at 7-9. The patent examiner cited as prior art numerous construction plans that were made publically available by the City of Redmond, Washington ("Prior Art"). *Id.*

On November 1, 2007, Plaintiffs responded to the office action. *See* Phillips Decl., Exh. B. In that response, Plaintiffs did not amend claims 10 or 11. *Id.* Instead, Plaintiff argued that "even though [in the Prior Art] there is a small sag in the sheet fabric underneath the grate, it is not sufficient to be considered to be a 'bag' within the meaning of claim 10." *Id.* at 8. Plaintiffs concluded that "[t]he difference between the invention of the ' 925 patent, which has a bag with substantial capacity, compared with the sheet fabric stretched beneath a grating (as in the [Prior Art] ) is clear." *Id.* at 16.

On February 11, 2008, the patent examiner issued a final office action for the reexamination proceeding. *See* Phillips Decl., Exh. C. In that action, the patent examiner rejected Plaintiffs' contentions that the claims should not be rejected in light of the Prior Art. *Id.* at 6-8.

On March 12, 2008, Plaintiffs requested an amendment to claim 10 of the ' 925 patent. *See* Phillips Decl., Exh D. Plaintiffs proposed amending claim 10 by including the phrase "preforming the filter bag by joining sidewall portions together." *Id.* Plaintiffs argued as follows:

Claim 10, as amended, is patentably distinct from the prior art applied against claim 10. As noted above, the [Prior Art] illustrates a sheet of fabric stretched beneath a grating, positioned in a catch basin. Although the sheet of fabric may have a slight sag in it, it does not have a filter bag

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 30
Page 210

Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)
**(Cite as: 2008 WL 4414763 (W.D.Wash.))**

which is preformed "by joining sidewall portions together."

*Id.* at 10.

The patent examiner granted Plaintiffs' amendment and claim 10 currently provides as follows:

10. A method of installing a catch basin filter in a catch basin, the catch basin comprising:

an inlet through which water and solids flow into the catch basin, an outlet through which water flows out of the catch basin, wherein the inlet is positioned above the outlet, and a plurality of basin sidewalls, each sidewall having an upper end at the inlet and a recess located at the upper end, the sidewalls defining a chamber, the grate located on the top of the basin inlet and having grate sides positioned in the recesses, and the filter comprising:

\*3 a filter bag having an open top, a closed bottom and one or more sidewalls extending between the top and the bottom of the bag; and

a flap joining the top of each sidewall, said method comprising the steps of:

preforming the filter bag by joining sidewall portions together;

placing the filter bag in the catch basin so that each of the bag sidewalls are adjacent to the catch basin sidewalls and the filter bag open top is positioned above the filter bag closed bottom;

placing each of the filter bag flaps into the recess of the upper end of the catch basin; and

sandwiching each of the filter bag flaps between the top of the basin and the grate sides, thereby holding the bag in place.

Reexamination Certificate, col. 1, ln. 24 to col. 2, ln. 25 (emphasis in original and indicates reexamination amendment). The parties dispute the reason for and consequences of that amendment. *See* Dkts.

87 at 4-5 and 99 at 3-5.

## III. DISCUSSION

Defendants request that the Court grant summary judgment as follows:

(1) That none of Defendants' activities before the date of the reexamination certificate have or will infringe the '925 Patent;

(2) That Defendants have absolute intervening rights to sell all Drain Web products in inventory as of the date of the reexamination certificate, free of any liability whatsoever to Plaintiffs;

(3) MetroChem did not breach the Settlement Agreement; and

(4) That all Plaintiffs' claims are dismissed with prejudice.

Dkt. 87 at 13.

### A. Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a materi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 30
Page 211

Page 4

Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)
(Cite as: 2008 WL 4414763 (W.D.Wash.))

al fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial-e.g., a preponderance of the evidence in most civil cases. *Anderson,* 477 U.S. at 254; *T.W. Elec. Serv., Inc.,* 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.,* 809 F.2d at 630 (relying on *Anderson, supra* ). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888-89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

**B. Plaintiffs' Patent Rights**

*4 35 U.S.C. § 307 provides, in part, as follows:

Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding will have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.

35 U.S.C. § 307(b). Section 252 provides as follows:

The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are *substantially identical,* such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are *substantially identical* with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

35 U.S.C. § 252 (emphasis added).

"The effect of a reexamined patent during the period before issuance of the reexamination certificate is governed by 35 U.S.C. § 307(b), which provides that the rules established in § 252 for reissued patents shall apply to reexamined patents." *Bloom Eng'g Co. v. N. Am. Mfg. Co.,* 129 F.3d 1247, 1249 (Fed.Cir.1997). Moreover, "the making of substantive changes in the claims is treated as an irrebuttable presumption that the original claims were materially flawed. Thus the statute relieves those who may have infringed the original claims from liability during the period before the claims are validated." *Id.*

Plaintiffs have alleged that Defendants have infringed claims 10 and 11 of their '925 Patent. Because claim 11 is dependant upon claim 10, the only amendment in question is the addition to claim 10 of the phrase "preforming the filter bag by joining sidewall portions together." The parties dispute whether this amendment was a substantive change altering the scope of the asserted claim. "[I]n determining whether substantive changes have been made, we must discern whether the *scope* of the claims are identical, not merely whether different words are used." *Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1346 (Fed.Cir.1998) (emphasis in ori-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 30
Page 212

Page 5

Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)
(Cite as: 2008 WL 4414763 (W.D.Wash.))

ginal). The determination of whether the reex-
amined claims remain identical in scope is a ques-
tion of law. *Id.* at 1347.

Defendants argue that "the reexamination amend-
ment added a new limitation for the express pur-
pose of changing the claim scope to secure its al-
lowance in amended, narrower form." Dkt. 101 at
8. The fact that the patent examiner rejected the ori-
ginal claims in light of prior art is compelling evid-
ence in support of that position. It would seem that
the Prior Art must have been within the scope of
original claim 10 of the '925 patent and, therefore,
that claim was invalid as originally drafted. The
claim was then amended and overcame the final of-
fice action rejecting claim 10 in light of the Prior
Art.

\*5 Plaintiffs counter that "the amendment simply
clarified the claims to explain the meaning of 'filter
bag' and expressly identify [sic] a necessary step
without changing the scope of the claims." Dkt. 99
at 10. Plaintiff cites two cases in support of its posi-
tion: *Tennant Co. v. Hako Minuteman, Inc.,* 878
F.2d 1413 (Fed.Cir.1989) and *Key Manufacturing
Group v. Microdot, Inc.,* 679 F.Supp. 648
(E.D.Mich.1987), *aff'd in relevant part, vacated on
other ground,* 854 F.2d 1328 (Fed.Cir.1988)
(unpublished table decision). In *Tennant,* the patent
holder amended the original claim by adding the
word "bottom" to the claim. *Tennant,* 878 F.2d at
1417. The court stated that:

> The addition of the word "bottom" does not sub-
> stantively change the scope of original claim 2,
> *but merely makes the claim more definite.* The
> '070 specification makes numerous references to
> a movable bottom wall.... Moreover, original
> claim 1 provides for "a movable first wall sec-
> tion" and "a second bottom wall section." Be-
> cause a second cannot exist without a first, com-
> mon sense dictates that the claimed first wall sec-
> tion is also a bottom wall section.

*Id.* (emphasis added).

In *Microdot,* the district court held that "[t]he addi-
tional language of the amendment does not call for
anything new, but rather details what is already
contemplated by the claims." *Microdot,* 679
F.Supp. at 663. The Federal Circuit "agree[d] and
[saw] no reason to disturb [the district court's] judg-
ment on this issue." 854 F.2d 1328.

In this case, Plaintiffs claim that "[t]he amendment
made explicit a step that was already implicitly
present in which the patent specification and draw-
ings show [that it] necessarily had to be preformed
in order to make the filter bag specified in the ori-
ginal claim." Dkt. 100, Declaration of H. Van
Smith ("Smith Decl."), ¶ 6. Plaintiffs point out that
the '925 patent specification provides the basis for
the amendment as follows:

> Filter bag 28 includes four tapered sidewalls 38
> each located adjacent one wall of basin 12. The
> sidewalls are sewn together to form the closed
> filter bag ....

*Id.* (citing '925 patent, col. 2, lns. 36-38) (emphasis
in '925 patent). The patent examiner, however, did
not reject the amendment in which Plaintiffs allege
to have support in the specification. The patent ex-
aminer rejected the claim in light of Prior Art that
disclosed a "filter bag having an open top, closed
bottom, side walls ...." Phillips Decl., Exh. A at 6.
The Court is unaware of any evidence showing that
the Prior Art disclosed a filter bag with sidewalls
that were "sewn" or "joined" together. Thus, when
Plaintiffs amended claim 10 to include the limita-
tion "preforming the filter bag by joining sidewall
portions together," they made a substantive change
to the scope of claim 10. In other words, this
amendment was not a clarifying amendment; it was
a scope limiting amendment in that it added a limit-
ation to the filter bag element of the claim.

\*6 Plaintiffs' final argument is that "there is a genu-
ine issue of material fact whether the [Prior Art]
cited by the USPTO satisfy the *Ruth* test for de-
termining whether two claims have different
scope." Dkt. 99 at 9 (referring to *In re Ruth,* 47

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 30
Page 213

Page 6

Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)
(Cite as: 2008 WL 4414763 (W.D.Wash.))

C.C.P.A. 1014, 278 F.2d 729 (C .C.P.A.1960)). In *Ruth,* the court concluded that "[a] claim of a reissue enlarges the scope of the claims of the patent if it is broader than such claims in any respect ... [or] if it contains within its scope any conceivable apparatus or process which would not have infringed the original patent." 278 F.2d 730. Plaintiffs argue that infringement is a question of fact and, therefore, applying this test raises questions of fact. Dkt. 99 at 9. Plaintiffs' arguments are unavailing. *See Laitram,* 163 F.3d at 1347 ("determination of whether the reexamined claims remain identical in scope is a question of law").

Therefore, the Court grants Defendants' motion for summary judgment on non-infringement before the date of the reexamination certificate because, during reexamination, Plaintiffs substantively altered the scope of claim 10 of the ' 925 patent. This ruling does not resolve the issue of whether Defendants are currently infringing Plaintiffs' '925 patent.

Defendants argue that:

> neither the patent claims nor the accused product on which Plaintiffs' entire case is based continues to exist. If after investigating the new product that Defendants manufacture after the issuance date of the reexamination certificate, and analyzing it against the *different* claims of the reexamined ' 925 patent, Plaintiffs decide that product infringes *those* claims, Plaintiffs can file a new action against Defendants. *This case,* however, is over.

Dkt. 101 at 4 (emphasis in original). Plaintiffs, however, have alleged that:

> Defendants are making, using, selling, and/or offering for sale at least one product that, when used for its intended purpose and as instructed, infringes one or more claims of the ['925] Patent directly, contributorily or by inducement.

Amended Complaint, ¶ 40.

Although Defendants seek to limit this case to

"original claims 10 and 11 and the Drain Web" product, Plaintiffs' allegations sufficiently cover the '925 Patent as well as other products. *See id.* ¶ 8 ("one or more claims of the patent") and ¶ 22 ("at least Claims 10 and 11 of the ['925] Patent"). Therefore, Defendants have failed to show, at this point, that Plaintiffs' claim for patent infringement should be dismissed in its entirety.

**C. Intervening Rights**

Defendants move the Court for an order that Defendants "have absolute intervening rights to sell all Drain Web products in inventory as of the date of the reexamination certificate, free of any liability whatsoever to Plaintiffs." Dkt. 87 at 13. Plaintiffs have failed to respond to this request. *See* Dkt. 99. Failure to respond to a motion may be considered as an admission that the motion has merit. Local Rule 7(b)(2).

*7 The patent law, 35 U.S.C. § 252, provides for intervening rights of a manufacturer who does not infringe a valid claim of the reissued patent which was in the original patent. In other words, a person may use, offer, or sell a product that was made before the reexamination certificate issues so long as this activity does not infringe a claim of the reissue patent that was in the original patent. *BIC Leisure Products, Inc. v. Windsurfing Intern., Inc.,* 1 F.3d 1214, 1220-21. The Court concludes that Plaintiffs have substantively altered the scope of claim 10 by amending that claim during the reexamination proceeding. Therefore, Defendants' motion for intervening rights is granted because the amended claim 10 was not in the original '925 patent.

**D. Breach of Contract**

As an initial matter, Defendants provide scant authority for their request to dismiss Plaintiffs' breach of contract claims. *See* Dkts. 87 at 12-13 and 101 at 9-10. Defendants, however, claim that they did not infringe "Valid Claims" of Plaintiffs' '925 Patent as agreed to in the Settlement Agreement because the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 30
Page 214

Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)
**(Cite as: 2008 WL 4414763 (W.D.Wash.))**

patent examiner's final action declared that original claims 10 and 11 were unpatentable based on prior art. Dkt. 87 at 12. Because those original claims were unpatentable, Defendants argue that they were not infringing "Valid Claims" of Plaintiffs' '925 patent. *Id.* Plaintiffs counter that the claims were valid until they *"have been* held" to be unpatentable. Dkt. 99 at 12. Defendants contend that Plaintiffs' proposed reading of the Settlement Agreement is unreasonable. Dkt. 101 at 9.

What is evidenced by these arguments is that the Court will be asked to engage in contract interpretation. Defendants have failed to show that the Court should engage in such an interpretation before the record has been fully developed. It may well be that there is no ambiguity in the language of the Settlement Agreement, but Defendants have failed to show that a preliminary summary judgment motion is the proper procedural vehicle that should be used to reach that conclusion. The reexamination proceeding altered aspects of this case and Plaintiffs are entitled to discovery on the remaining contract issue.

Therefore, the Court denies, without prejudice, Defendants' request for a ruling that MetroChem did not breach the Settlement Agreement because Defendants have failed to show that they are entitled to summary judgment as a matter of law.

### IV. ORDER

Therefore, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt.87) is **GRANTED in part** and **DENIED, without prejudice, in part** as follows:

(1) Defendants' request that none of its activities before the date of the reexamination certificate have or will infringe the '925 Patent is **GRANTED;**

(2) Defendants' request for absolute intervening rights to sell products in inventory as of the date of the reexamination is **GRANTED;**

(3) Defendants' request that MetroChem did not breach the Settlement Agreement is **DENIED;** and

*8 (4) Defendants' request that all Plaintiffs' claims be dismissed with prejudice is **DENIED.**

W.D.Wash.,2008.
Atlantic Const. Fabrics, Inc. v. Metrochem, Inc.
Not Reported in F.Supp.2d, 2008 WL 4414763 (W.D.Wash.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 30
Page 215